918 A.2d 63 (2007)
391 N.J. Super. 322
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
B.H., Defendant-Appellant.
In the Matter of O.F., A.F. and E.F., Minors.
Superior Court of New Jersey, Appellate Division.
Submitted February 7, 2007.
Decided March 22, 2007.
*66 Yvonne Smith Segars, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).
Stuart Rabner, Attorney General, attorney for respondent (Michael J. Haas, Assistant Attorney General, of counsel and on the brief; Frederick A. Mick, Deputy Attorney General, on the brief).
Yvonne Smith Segars, Public Defender, Law Guardian for the minors O.F., A.F., and E.F. (Aleli M. Clemente-Crawford, Designated Counsel, on the brief).
Before Judges A.A. RODRÍGUEZ, SABATINO and LYONS.
The opinion of the court was delivered by
LYONS, J.S.C. (temporarily assigned).
In this child abuse and neglect matter, defendant, B.H. appeals from a judgment entered by the trial court terminating litigation concerning her three children. We affirm.
B.H. is the mother of three minor sons: O.F., A.F., and E.F. The biological father of the three children is O.F., Sr., B.H.'s former husband. B.H. and O.F., Sr. obtained a final judgment of divorce on May 16, 2002 and sole custody of the children was awarded to B.H.; O.F., Sr. was granted visitation rights. The children lived in a home with their mother and approximately ten other relatives, including their maternal grandmother, uncles, aunts and cousins.
On November 26, 2002, the Division of Youth and Family Services ("DYFS" or "Division") was contacted by a female caller who stated that a few days earlier, O.F.'s uncle and B.H. hit O.F. in the face causing him to bleed. The caller also notified *67 DYFS that the children were dirty and had no clean clothes, that B.H. made the children run a mile each day, and that the house was overcrowded.
A DYFS worker went to B.H.'s home on that date, accompanied by police, to investigate the referral. During the visit, the DYFS worker observed six children in the living area of the home, noting that they were clean and pleasant. The worker also noted that the house was cluttered.
While at the home, the DYFS worker interviewed O.F. about the allegations outside the presence of B.H., but in the company of his maternal aunt and grandmother, who refused to leave the room. O.F. admitted that "his mother and father have both hit him hard" with their hands, that he has been "smacked in the face and hit wherever they could reach" but could not recall the last time that he was actually hit. O.F. admitted that he has nosebleeds, but acknowledged that he did not know what caused them. O.F. denied that he was afraid of his mother and father, denied that other adults in the home physically disciplined him, and stated that he would prefer to live with his father because "his father has more fun things at his house."
O.F. told the DYFS worker that he only runs when he is late for school and is trying to catch the bus. The DYFS worker was unable to interview B.H.'s two younger children because they were running around the house. During the interview, the children's maternal grandmother admitted that O.F.'s father "disciplined him in the past but that they took care of that."
The DYFS worker also spoke with B.H. during the visit. B.H. expressed suspicion that her former husband's wife, T.F., made the DYFS referral because she wanted the children removed from her care. B.H. informed the DYFS worker that the Division had been to her home in the past because the children's father had used physical discipline and because another woman previously alleged that B.H. was a neglectful mother.
With regard to disciplinary practices, B.H. stated that she used time-out chairs, denied that her family abuses her children, but admitted that at times, her brothers play roughly with the children. B.H. acknowledged that she "spanks [the children] on their rearends or taps their hand but denied that it is abusive." When asked about the number of persons residing in the home, B.H.'s sister interjected that the worker did not need that information and became upset, refusing to show the worker the bedrooms. When she asked about sleeping arrangements, B.H. became defensive, stated that the home has six rooms, and that there was sufficient space for the children. B.H. also denied that she made the children run.
B.H. permitted the worker to examine the children's bodies for bruises, though none were found. A.F. showed the worker his lip and told her that he had "`busted' [it] on the jungle gym at school." The DYFS worker noted a healed scratch mark on O.F.'s right cheek and a similar healed scratch mark on A.F.'s stomach which B.H. explained were caused by playing. The DYFS worker then left the home with the officers.
Once outside, one of the officers informed the worker that he observed a bedroom to be cluttered with clothing and paper, but denied any unsanitary or dangerous conditions. Both the officers and the worker concluded that the children were not in imminent risk of harm and were safe for the night. The worker recommended that interviews of the children be taken at school.
On November 27, 2002, two DYFS workers went to the children's elementary *68 school to interview O.F., A.F. and E.F.O.F. was interviewed first. With regard to the family living situation, O.F. stated that his mother, A.F., E.F., his three uncles, four aunts, and two other children live with him at the home. O.F. denied that his mother forced him to run but told the worker that he had been practicing at home for the school's mile run.
When asked about disciplinary practices at the house, O.F. stated that his Uncle Ben punched A.F. in the face but was unsure of when this occurred and denied that A.F. bled or had a mark on his face as a result. O.F. also stated that his Uncle Ben hits him and all the children in the house with his hand. O.F. also informed the worker that his other uncles have hit him and the other children in the past and that his mother has told the uncles to stop. O.F. also stated that his mother hits him in the face when he does "bad stuff" and that his grandmother hits the children on their hands.
A.F. was interviewed at school following O.F.A.F. confirmed O.F.'s account that over ten people lived in the home. With regard to disciplinary practices, A.F. states that he is sent to "the black chair for time-outs." A.F. told the worker that his Uncle Ben had hit him on his lip the day before the interview, causing it to bleed and that this event was witnessed by his Uncle Bobby. The worker, however, was unable to observe any cuts or marks on the child's face. Moreover, A.F. told the worker that he saw "Ben hit O.F. in the nose," that the child's nose did not bleed, and that no one else hits him or his brothers.
Following A.F.'s interview, the worker spoke with E.F. at school. E.F. stated that he was afraid of his Uncles Ben and Bobby but did not articulate why. E.F. acknowledged that his uncles fight him and that his Uncle Ben hit him two times. The child was unable to demonstrate where he had been hit. E.F. denied that his Uncle Ben hits anyone else in the home.
Information garnered from the school interviews indicated that the children witnessed physical disputes between the adults in the house. O.F. recalled seeing his Uncle Ben hit his Aunt Barbara. A.F. told the worker that "Ben and grandma hit each other."
Later that day, DYFS workers went to the home to interview the family. At this interview, B.H. again denied that she made her children run against their will. B.H. asserted that A.F.'s nose bleeds on its own when the child is at her house, but that it bled a month ago at his father's house because T.F. hit him. B.H. again argued that DYFS was called by the children's father and T.F. out of spite. She also acknowledged that she "uses the black chair for time-outs and will sometimes hit [the children] or spank them." B.H. also informed the worker that the children's grandmother sometimes hits them on the hand. B.H. stated that the children have good relationships with their uncles and that she would not tolerate abuse if she saw it. She acknowledged that O.F. used to be hit in the chest and stomach by his Uncle Ben but that she ended such behavior. B.H. also admitted that Ben does not like O.F. because O.F. "tries to be big and talk big to Ben" and "O.F. thinks Ben's friends are his friends."
With regard to the living arrangements at the home, B.H. stated that she sleeps with her sister, the children sleep in their separate room, the grandmother sleeps in her room or the couch, one of the aunts and her children sleep in the grandmother's room, and Uncles Ben and Bobby sleep downstairs. B.H. informed the worker that she intended to move to Delaware at the end of the year with a friend of *69 hers and that she was going to seek employment after the move.
The DYFS workers then interviewed Uncle Ben who denied punching O.F. in the nose, but admitted that he used to hit and push the three children before B.H. instructed him not to do so. Ben also admitted to hitting Barbara after he became angry during the playing of a board game.
After Ben's interview, the maternal grandmother demanded to speak with the DYFS worker. The grandmother stated that most of the events the worker heard about occurred a year earlier and that the situation at home was fine.
Following the interviews, the worker inspected the house. The worker noted clutter throughout the home, especially the bedrooms, and a broken glass window on the first floor which B.H. promised to repair that day. On December 11, 2002, B.H. informed DYFS that the window had been fixed and the bedrooms had been cleaned. On a visit to the home on December 20, 2002, the worker noted that indeed, the rooms had been tidied up and the window was repaired. At the end of this investigation, DYFS closed the case, concluding that the referral of neglect was unsubstantiated.
On March 25, 2003, the Division received another child abuse referral concerning then seven-year-old, O.F. On that date, the referent taught a child abuse prevention class at O.F.'s school. Referent informed DYFS that after class, O.F. told the referent that he did not feel safe at home and that his uncle "throws [him] against the wall and makes [his] nose bleed." A DYFS worker interviewed O.F. later that afternoon.
At the interview, O.F. told the worker that he felt he was safe at home but that his two uncles would hit him when they played football. O.F. denied ever being hurt by his uncles and stated that his uncles never hit him in anger, only when they played football. O.F. denied that any adult in the home hits him or any of the children and said that he was not afraid of his mother. Without giving a specific date, O.F. recounted that his mother became angry with him when he disrespected an adult and moved to hit him, but that when he flinched, he hit himself in the nose, causing it to bleed.
The worker then spoke with six-year-old A.F. who similarly denied any adult in the home ever hit him. A.F. told the worker that he "play fights" with his Uncles Ben and Bob, but denied that they ever purposefully hurt him. A.F. acknowledged however, that he saw his Uncle Ben "hit [O.F.] in the nose yesterday, causing [O.F.'s] nose to bleed while they were playing with each other," but denied that Ben and O.F. were angry at each other at the time of the incident. A.F. told the worker that O.F. informed his mother of his uncle's actions.
The worker spoke with then four-year-old, E.F. who likewise denied being hit by any of the adults in the home. E.F. also denied "play fighting" with his uncles. E.F. informed the DYFS worker that O.F.'s mother made his nose bleed but that he was not present and was unsure what happened.
The worker then interviewed B.H., who stated that she was frustrated by the referral. B.H. was adamant that she took good care of the children and that they were not in a dangerous environment. B.H. said that since the prior referral had been made, the children were never left unsupervised with their uncles.
With regard to O.F.'s disclosure of the most recent nosebleed, B.H. stated that a week earlier, O.F. "made a smart remark to an adult in the home" and that she *70 raised her hand at him, causing him to flinch, strike himself, and cause his nose to bleed. With regard to O.F.'s claim that his uncle hit him in the face and caused him to bleed, B.H. stated that she was unaware of this event.
The worker then interviewed Uncles Ben and Bob, who both denied knowledge of O.F.'s nosebleed or hitting or "play fighting" any of the children.
At the conclusion of its investigation, DYFS was unable to "determine with certainty that there was an incident in which [O.F.] was hit by his uncle, causing a nose bleed." Accordingly, DYFS closed the case as not substantiated.
On March 27, 2003, E.F.'s pediatrician made a referral to DYFS when four-year-old E.F. was taken by T.F. to his office for a school physical examination. T.F. stated that during the ride, E.F. complained of pain in his right knee. During examination, E.F. told the doctor that his mother became angry with him and pushed him down to the ground, causing him to hurt his knee. The doctor evaluated E.F.'s knee but found no marks or injuries.
DYFS began its investigation on that day, visiting O.F. Sr.'s home where O.F., Sr., T.F., O.F. and E.F. were present. T.F. stated that E.F. complained in the past of being hit by his mother and that she and her husband feared for his safety. T.F. told the worker that she and her husband visit with O.F., A.F., and E.F. often and that there have been complaints from all three children about being hit in their mother's home.
The worker then interviewed E.F., who stated that his mother became angry with him, pushed him, and caused him to fall to the ground. E.F. could not recall when this event occurred and could not remember the last time he or his brothers were hit. But for this incident, E.F. denied that his mother or any other adult in the home hurt him or his brothers. The worker then performed a full body check of E.F. in the presence of O.F., Sr. and T.F. but did not locate any marks or bruises of concern.
On March 28, 2003, the DYFS worker spoke with the children's guidance counselor and the school nurse. Both stated that they had "no major concerns" for O.F. and A.F. On this date, the worker also interviewed A.F. in the presence of the guidance counselor. A.F. said that he heard from family members that B.H. had kicked E.F. and that E.F. did not appear to be hurt. When asked about disciplinary practices at home, A.F. stated that his mother spanks them "on the butt-with belt"; he could not recall the last time he or his brothers were spanked and denied ever having marks or bruises. A.F. was examined by the school nurse, but did not have any bruises or marks.
The DYFS worker then questioned O.F. in the presence of the guidance counselor concerning E.F.'s knee. Though O.F. did not see the incident, he claimed that E.F. told him that his mother had pushed him, complained that his knee was sore, and that his Aunt Brenda put a bandage on the knee. When asked about disciplinary practices in the home, O.F. stated that he and his brothers are put on time-outs and that he was not afraid of anyone in the house. O.F. was examined by the school nurse and did not have any bruises or marks of concern.
Following the interviews, the worker contacted the pediatrician who expressed no further concerns for E.F.'s safety other than his complaint about his knee.
The worker went to B.H.'s home in the mid-afternoon of March 28, 2003 to speak with her. B.H. asserted that the accusations made were "totally false," denied "any incident in which she hit or kicked *71 [E.F.] causing him to hurt his knee," and denied "ever hurting her children." B.H. stated that she was unaware of E.F. complaining about pain in his knee. E.F.'s grandmother was also present during the interview and similarly denied that E.F. complained about his knee.
Following the investigation, the DYFS worker reasoned that, although E.F. stated he was pushed to the ground by his mother, he was examined by the pediatrician, appeared to be fine, and did not have any marks or bruises on his knee or other parts of his body. Moreover, the worker noted that B.H. denied ever pushing E.F. Accordingly, the worker concluded that the allegation of physical abuse was "not substantiated."
DYFS received its next referral concerning this family on April 26, 2005 when E.F.'s guidance counselor reported that then six-year-old, E.F. appeared at school with a one-inch welt under his left eye. E.F. disclosed to the counselor that his mother hit him the night before with a belt across the face and legs after he brought home a bad report card from school. E.F. did not see the school nurse and had no bruises or marks on his legs. E.F. told the counselor that he was "probably going to get it tonight too, but did not say why." A DYFS worker came to the elementary school later that afternoon.
The worker interviewed E.F. in the presence of the guidance counselor and noted the reported welt under the child's eye. After the worker questioned what happened to E.F.'s eye, E.F. stated, "I got a bad report card. My mom told me to get my belt and she wopped me . . . I got hit in the face, legs, arm, and butt." E.F. also told the worker that his brothers were hit. Specifically, A.F. was hit in the face and O.F. on the stomach. When asked "what happens to him when he gets in trouble . . . [E.F.] said `she woops us.'" E.F. stated that his mother uses her hand and a belt to hit him.
During the interview, E.F. informed the worker that his mother was "making a test for [him] tonight," that she was going to make it difficult, and that if he did not finish it, he was afraid he was going to be hit again. E.F. denied being afraid of his mother but admitted that he was afraid of being hit. E.F. also told the worker that his Uncle Ben has hit him with his hand and that his maternal grandmother hit him in the past with her hands and a stick.
Later that afternoon, the DYFS worker, a buddy worker, and a patrolman went to the home. The maternal grandmother denied the workers entry, stating that B.H. was at the hairdressers and did not know when she would return.
One hour later, the worker called B.H. on her mobile phone to schedule an interview. B.H. stated:
I did not hit him in the face or on his arms. I hit him on the butt. I only hit him in the behind and legs. I am allowed to chastise my son for acting up in school. I am allowed to hit my son on the butt with a belt. I only hit him three times.
The workers also asked B.H. to return to her home and to tell her mother to allow the workers into the home to interview the children. B.H. said that she would not make herself available until the next morning because she was having her hair braided. The buddy worker told the DYFS worker that the home was "deplorable" but not unsafe, and that he interviewed all six children. The buddy worker also stated that E.F.'s two older siblings said they saw their mother hit E.F. with a belt.
On that night, the DYFS worker phoned B.H. and asked her to sign a safety plan promising that she would not hit the children. *72 According to the DYFS report, B.H. asserted:
I will not agree to not hitting my kids. You have no right to tell me I can't hit my kids. I only hit them when it rises to that level. I will not sign a form saying I will not chastise my kids. I only hit them when they do this like; biting, kicking, threatening someone else. I only took a little belt that he wears. It is made out of cloth. You have no right to tell me how to raise my kids.
The buddy worker then contacted B.H. and informed her that if she did not sign the safety plan, her kids would be removed. After speaking to a human resources police officer, B.H. agreed to come to the DYFS office and sign the safety plan.
B.H. went to the DYFS office later that evening along with her sister and a friend to sign the safety plan. According to the report, as soon as she heard "Mom agrees not to use belt as a means of discipline," B.H. refused to sign the plan. After a discussion with her sister, B.H. hesitatingly signed the plan. B.H. adamantly stated that,
it was her right to chastise her children and that she only used the belt as a last means. . . . she did not hit [E.F.] in the face and that it was his own cloth belt. . . . she folded the buckle underneath and put it in her palm. . . . the division had no right telling her she could not chastise her kids.
On the morning of April 27, 2005, a DYFS worker and a supervisor went to B.H.'s home to inform her of court proceedings. B.H. allowed them to enter the home. The worker noticed broken windows in the living room and in the kitchen. The worker also documented that the house was cluttered, that a tub in one bathroom and a toilet in the other did not work, but concluded that the house was "not dirty or unsafe."
While at the home, B.H. "told worker that maybe she hit the child in the face by accident and didn't realise it, but doesn't see how. She folded the buckle down in her hand and bent down to hit him on the butt. She said maybe she got him in the legs." B.H. also told the worker that "when she received the call from DYFS the night before, she did not take it seriously" and that "if her kids had to learn a lesson by going into foster care, then that is what had to happen." B.H. also made clear to the worker that, "she doesn't want the judge to tell her she can't use a belt on her children. She is not abusing her kids and does not hit them often, only when they disrespect other people, bite, kick and threaten other children."
On April 27, 2005, DYFS filed a verified complaint against B.H. and O.F., Sr. pursuant to N.J.S.A. 9:6-8.21 to -8.73 and N.J.S.A. 30:4C-12 to -22 seeking continuing care and supervision of the children. On that date, the court executed an order to show cause compelling B.H. to appear in court and explain why the children should not be placed in the care and supervision of the Division.
On May 2, 2005, a DYFS worker arrived at O.F. Sr.'s residence to serve the complaint and order to show cause. The worker noted that the home was neat and clean. O.F. Sr. agreed to take the children, and told the worker that "B.H. tells us nothing about the kids. She doesn't take the kids to the doctors. She sends the kids here with bags of clothes to wash . . . The kids told me they don't wash up at home. The two older boys are protective of her."
On May 3, 2005, a DYFS worker received a call from the school guidance counselor who stated that during one of *73 E.F.'s child study team conferences B.H. "went off on [E.F.'s] teacher. She had the teacher very upset. She was screaming at her and accusing her of making the referral. Mom said she was going to do something to the school about the things that are done there. She accused the school of being neglectful." On that date, DYFS substantiated physical abuse against B.H. concluding:
Allegation of physical abuse against [B.H.] is substantiated. Worker witnessed a welt under child's left eye and child said his mother hit him across the face with the belt. Buddy worker also saw the welt under the child's left eye. E.F.'s two older siblings told buddy worker they saw mom hit E.F. with a belt. Case will be opened at intake. Judge Raugh gave the Division care and supervision and ordered mom to have a psychological evaluation, parenting classes, and in-home services.
On May 11, 2005, this matter returned to court for the return on the order to show cause. At the hearing, Judge Kyran Connor heard very brief testimony from B.H.'s counsel, O.F., Sr., and the law guardian of the children. The judge then entered an order compelling B.H. to attend a psychological evaluation and parenting skill classes. It was further ordered that B.H. and the three children not reside in the family home until the home was free of safety hazards. By this time, however, B.H. had temporarily moved with the children to a motel. The court also restrained B.H. from administering any corporal punishment on the children, having concluded at the hearing that "I quite agree with the Division that what I read in the complaint is well beyond physical discipline. It's much more than is appropriate . . . [B.H.] will be restrained in today's order from engaging in any form of corporal punishment in the future." A fact-finding hearing was scheduled for August 10, 2005.
At the hearing, DYFS presented documentary evidence consisting of worker referral reports. B.H.'s counsel objected to findings being grounded upon "lesser third party included hearsay" but otherwise acknowledged that the reports were "standard DYFS documents . . . [and] exceptions to the hearsay rule in these proceedings."
Present at this hearing were counsel for DYFS, B.H., and O.F., Sr., as well as the children's law guardian. Also present were O.F. Sr., and B.H.; B.H. testified in her own defense. At the hearing, B.H. acknowledged that she spanked E.F. in April 2005 because his last report card said that he was disrespectful of others and their property. According to B.H., on that night, B.H. told E.F. to get his belt, and she hit him three times on his buttocks and twice on his leg. B.H. also acknowledged that she gave him subtraction problems for him to practice at home.
B.H. stated that E.F.'s welt was accidentally inflicted when his eye was caught by the belt buckle as he ran past her in anger:
So, I was on my way in the kitchen to go to the  to cook dinner, that's when my son said that I hit him in the eye. I had the belt in my hand . . . It's when I was in the threshold between the living room, dining room and the kitchen, that I had the belt in my hand and he ran past me, because he did run past me, because he was mad, and the belt got a hold of his eye. But I didn't know it at that time. They didn't tell me.
She also gave testimony that her children only told her of E.F.'s eye after she returned from DYFS the day after the incident and admitted hitting her other children with a belt "maybe one time." With regard to her disciplinary practices, B.H. stated that most of the time, she uses time-outs and forbids them from playing *74 video games. Further, B.H. testified, "if you ask my children, too, I rarely beat my children. I rarely spank my children with a belt; rarely." During re-direct, B.H. demonstrated how, while she was walking away, E.F. ran past her and "the belt got him in the eye."
The hearing judge did not find B.H.'s testimony or demonstration to be credible or consistent. The court noted while B.H. was adamant that she had a right to hit her kids, in court, she testified that she would comply with an order not to. While B.H. testified in court that the belt struck E.F.'s eye, B.H.'s account of this incident in the DYFS referral was that she folded the buckle underneath and put it in her palm. The judge also considered the opinion of a psychologist who performed evaluations of B.H. on May and June 2005:
[i]t is my strong opinion  no, my strong recommendation that [B.H.] receive medication evaluation by a psychiatrist . . . [B.H.] is clearly having psychological difficulty. She needs to commit to work with professionals who can help her find the combination of medication and therapy useful to increase the stability of her moods and the clarity of her thoughts. It would remain unsafe to consider any reunification with her children until she enters treatment and maintains active and cooperative . . . in her involvement.
The judge found B.H.'s explanation "an after the fact construction" and stated that the injury to E.F.'s eye occurred "essentially the way [E.F.] said it happened." Consequently, the court concluded by a preponderance of the evidence, that B.H. administered corporal punishment when she "struck the minor child, [E.F.], in the face with the buckle of a belt, leaving an injury to his eye" contrary to N.J.S.A. 9:6-8.21(c)(4)(b). The court entered a dispositional order giving DYFS care and supervision over the three children and giving O.F., Sr. physical custody. The order restricted B.H. from administering corporal punishment, and compelled her to attend psychiatric evaluations, anger management counseling, and parenting classes. B.H. was given visitation rights.
A compliance review hearing was held on October 19, 2005. Present at this hearing were the children's parents, as well as their counsel, counsel for DYFS, and the children's law guardian.
At the time this hearing was held, B.H. was attending counseling, but her attendance was sporadic. B.H. also refused to participate in psychiatric medication monitoring. During the hearing, DYFS informed the court that a domestic violence incident broke out between O.F., Sr. and his wife, T.F. and that T.F. had moved out of the house. Nonetheless, the judge did not find the children to be in danger and decided that visitation should remain in the discretion of the parents. An order was entered containing essentially the same provisions as the August 10, 2005 order. A compliance review hearing was scheduled for January 11, 2006.
At this hearing, DYFS sought to maintain care and supervision over the three children. B.H. was attending counseling at the time, but had not attended the psychiatric evaluation yet. B.H. however, was undergoing job counseling.
Contrary to DYFS' earlier wishes, B.H. still had not found new housing. Consequently, counsel for O.F., Sr. advocated for the termination of the litigation, arguing that the children wanted to stay with their father, that B.H. still did not have independent housing, and that DYFS was not offering O.F., Sr. services that help him preserve the best interests of the children anyway. Counsel for B.H. argued that while the children may be happy living with their father, their long-term wish to *75 live with their mother had not changed. The judge at that time concluded that it was premature to terminate the litigation with respect to O.F., Sr. and entered an order containing the same provisions as the August 10, 2005 order. Another compliance review hearing was scheduled for May 3, 2006.
B.H. and her counsel, counsel for O.F., Sr., counsel for DYFS and the law guardian appeared. As of this date, B.H. underwent psychological and psychiatric assistance and was participating in individual counseling. Also, B.H. had completed her parenting classes. The only issue objectionable to DYFS was the fact that B.H. had not yet arranged for new housing.
At this time, DYFS requested that the litigation be terminated. Finding that "the child(ren) have remained stable and safe in the legal custody of their biological father [O.F., Sr.]," Judge Connor issued an order terminating the litigation. The order also directed that the children were to remain in the legal and physical custody of their father and mother, but that physical custody remained with O.F., Sr.
The order of termination also commanded DYFS to "continue to provide counseling services for the three minor children and [B.H.] as long as they are compliant with said services," permitted visitation between B.H. and the children as arranged by the parties, barred the children from living at B.H.'s residence, and restricted unsupervised visits in the presence of the maternal grandmother, Uncle Bob, and Aunt Brenda.
In June 2006, B.H. filed a notice of appeal from the final order terminating litigation. She submits the following points for our consideration:
POINT I
B.H. WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE THE DIVISION ONLY PRESENTED ITS CONTACT SHEETS AND OTHER DOCUMENTARY EVIDENCE AND DID NOT PRESENT A LIVE WITNESS TO SUPPORT ITS ALLEGATIONS, AND COUNSEL FOR THE DEFENDANT PRODUCED NO WITNESSES EXCEPT THE DEFENDANT.
POINT II
THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A FINDING OF ABUSE OR NEGLECT.
POINT III
THE COURT ERRED BY FAILING TO ADDRESS VISITATION ISSUES, BY FAILING TO ORDER THE DIVISION TO PROVIDE SERVICES TO B.H. TO ADDRESS THE PROBLEMS OBSERVED IN ITS FINDINGS AND BY FAILING TO KEEP THE MATTER OPEN FOR FURTHER PROCEEDINGS REGARDING CUSTODY AND VISITATION.
We turn now to our consideration of the arguments advanced by the parties and the applicable legal principles.

I.
The primary issue in this appeal is whether B.H. was denied effective assistance of counsel. B.H. submits that she was denied effective assistance during the hearings in that counsel failed to introduce both physical and testimonial evidence that would have helped her cause, relying only upon the DYFS reports and her own testimony. B.H. specifically asserts that counsel failed to present any witnesses who were present at the time E.F. was allegedly hit with the belt. B.H. states that the maternal grandmother should have been called, since she told DYFS workers that B.H. hit the children with a belt. B.H. also states that none of E.F.'s siblings were called to testify and E.F. was not *76 cross-examined as to his version of events. DYFS workers were also not called to testify and no medical evidence was submitted to establish the severity of E.F.'s eye injury. Moreover, no pictures of E.F.'s injury or the belt allegedly used to inflict same were produced.
Plaintiff, on the other hand, argues that B.H. has failed to prove that she had ineffective assistance of counsel. Plaintiff asserts that B.H. has not shown that her counsel made any errors that would have altered the outcome of the hearing or that she was deprived of a fair trial. Plaintiff, therefore, argues that the trial judge's decision should be affirmed. The law guardian argues similarly, stating that B.H.'s counsel acted reasonably in using a trial strategy meant to prevent prejudice from occurring to defendant.
Before turning to the analysis of this point, it is first important to note that the issue of ineffective assistance of counsel was not raised below. Appellate courts may "decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available `unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973)(quoting Reynolds Offset Co. v. Summer, 58 N.J.Super. 542, 548, 156 A.2d 737 (App.Div.1959), certif. denied, 31 N.J. 554, 158 A.2d 453 (1960)). According to R. 2:10-2, an appellate court will not reverse an error not brought to the attention of the trial court unless the appellant shows that it was "plain error," that is, "error clearly capable of producing an unjust result." R. 2:10-2. Parental rights and ineffective assistance of counsel being matters of great public interest, we have considered the parties' arguments on this issue.[1]
Defendant claims that she was prejudicially denied her right to effective assistance of counsel. Before reaching that argument, it is important to consider whether the right to counsel exists in a non-criminal, child abuse and neglect matter like the one at hand.
While the Sixth Amendment of the Federal Constitution and Article I, Paragraph Ten of the State Constitution provide for the right to counsel in criminal cases, both the United States Supreme Court and the courts of this State have recognized that parents whose rights to their children are challenged by the State are entitled to due process protections. In Stanley v. Illinois, for example, the Court held that the right to custody of one's children from arbitrary governmental action is a fundamental constitutional right meriting due process. 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Indeed, "the integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment." Id. at 651, 92 S.Ct. at 1213, 31 L.Ed.2d at 559; see also Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626-27, 67 L.Ed. 1042, 1045 (1923); Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942); Griswold v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510, 522 (1965) (Goldberg J., concurring).
Our courts have similarly acknowledged the existence of constitutional due process rights with regard to parental interests over their children. It is well-settled that "for the State to temporarily or permanently deprive indigent parents of *77 their children under statutes concerned with dependent and neglected children, without providing counsel, constitutes a fundamental depravation of procedural due process." In re Guardianship of C.M., 158 N.J.Super. 585, 591, 386 A.2d 913 (J. & D.R. Ct.1978); see also Crist v. Div. of Youth and Fam. Servs., 128 N.J.Super. 402, 320 A.2d 203 (Law Div.1974), aff'd in part, rev'd in part on other grounds, 135 N.J.Super. 573, 343 A.2d 815 (App.Div. 1975). Consequently, our courts have held that these constitutional rights require:
that an indigent person have a right to the appointment of counsel in proceedings `which may result in either temporary loss of custody or permanent termination of their parental rights. Simple justice demands nothing less in light of the magnitude of the consequences involved.' The right to the aid of counsel is not a mere formality; it is the essence of justice.
[C.M., supra, 158 N.J.Super. at 591, 386 A.2d 913 (quoting Crist, supra, 135 N.J.Super. at 575, 343 A.2d 815); see also State v. Edge, 111 N.J.Super. 182, 268 A.2d 35 (App.Div.1970), rev'd on other grounds, 57 N.J. 580, 274 A.2d 42 (1971).]
The United States Supreme Court has recognized, moreover, that in contexts where it pertains, "the right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763, 774 (1970). The right is violated by the government when it interferes with counsel's ability to make independent decisions, and can be violated by counsel itself, when counsel deprives a defendant of effective or adequate assistance or representation. Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063-64, 80 L.Ed.2d 674, 692 (1984); see generally Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).
Both the statutory law and the case law of this State suggest that a defendant has a right to counsel when a complaint is filed against him or her charging abuse and neglect and threatening the individual's parental rights. N.J.S.A. 9:6-8.43(a) provides that indigent parents or guardians may apply to the Public Advocate for attorneys to represent them at Title 9 proceedings:
[t]he court shall advise the parent or guardian of his right to have an adjournment to retain counsel and consult with him. The court shall advise the respondent that if he is indigent, he may apply for an attorney through the Office of the Public Defender.
[N.J.S.A. 9:6-8.43(a).]
Under this statute, the court must "advise indigent parents of their right to have an attorney appointed to represent them." Div. of Youth and Fam. Servs. v. T.C., 251 N.J.Super. 419, 435, 598 A.2d 899 (App. Div.1991), certif. denied, 146 N.J. 564, 683 A.2d 1160 (1992)). Moreover, parents are entitled to retain counsel in cases where their custodial rights are threatened. Our court held, "[w]e are in complete accord that the Juvenile and Domestic Relations Court should assign counsel without cost to indigent parents who are subjected to proceedings which may result in either temporary loss of custody or permanent termination of their parental rights." Crist, supra, 135 N.J.Super. at 574, 343 A.2d 815. This view was later affirmed by our Supreme Court, which held, "[c]ourts have long recognized that parents charged with abuse or neglect of their children have a constitutional right to counsel . . . Title 9 acknowledges that right in child-abuse and neglect actions by providing defense counsel through OPD." Div. of *78 Youth and Fam. Servs. v. E.B., 137 N.J. 180, 186, 644 A.2d 1093 (1994).
In the instant case, a complaint was filed against B.H. alleging neglect and abuse under Titles 9 and 30 of the New Jersey Statutes. Through its pleadings, DYFS sought to intervene in B.H.'s parental and custodial rights to her three children. Based upon the standards discussed above, B.H. had the constitutional right to assistance of counsel during the fact-finding and compliance review hearings. Merely having counsel present, however, does not fulfill the constitutional requirements. Indeed, in the analogous criminal context, "[t]hat a person who happens to be a lawyer is present alongside the accused . . . is not enough to satisfy the constitutional command." Strickland, supra, 466 U.S. at 685, 104 S.Ct. at 2063, 80 L.Ed.2d at 693 (1984); see also State v. Fritz, 105 N.J. 42, 57, 519 A.2d 336 (1987). Having established that B.H. possessed the right to counsel, we now need to determine whether she was effectively represented.
There being no distinct test for the question of ineffective assistance of counsel in non-criminal cases, we consider the right to counsel utilizing, by analogy, the tests developed for purposes of the Federal Sixth Amendment and Article I, Paragraph Ten of the State Constitution as set forth by the United States Supreme Court in Strickland, supra, and adopted by our Supreme Court in Fritz, supra. See State v. Savage, 120 N.J. 594, 612-13, 577 A.2d 455 (1990); Div. of Youth and Fam. Servs. v. V.K., 236 N.J.Super. 243, 256, 565 A.2d 706 (App.Div.1989), certif. denied, 121 N.J. 614, 583 A.2d 315 (1990), cert. denied, Kliewer v. New Jersey, 495 U.S. 934, 110 S.Ct. 2178, 109 L.Ed.2d 507 (1990).
In Strickland, the Court held that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a fair result." 466 U.S. at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692-93; see also Savage, supra, 120 N.J. at 613, 577 A.2d 455. To assist in this determination, the Court outlined a two-part standard, based upon grounds of performance and prejudice, that a defendant must show to satisfy a claim of ineffective assistance of counsel:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the [court's holding] resulted from a breakdown in the adversary process that renders the result unreliable.
[Strickland, supra, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.]
In analyzing the "deficient performance" prong, "the test is whether counsel's conduct fell below an objective standard of reasonableness." Savage, supra, 120 N.J. at 614, 577 A.2d 455. A defendant therefore, must demonstrate that the attorney's actions "were beyond `the wide range of professionally competent assistance.'" Ibid. (quoting Strickland, supra, 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695). Reviewing courts should note that "`counsel is strongly presumed to have rendered adequate assistance' and to have made `all significant decisions in the exercise of reasonable professional judgment.'" Ibid.
*79 Moreover, reviewing courts "must be mindful that [their] inquiry is whether counsel's performance was `reasonable considering all the circumstances.' If counsel thoroughly investigates law and facts, considering all possible options, his or her trial strategy is `virtually unchallengeable.'" Savage, supra, 120 N.J. at 617-18, 577 A.2d 455 (quoting Strickland, supra, 466 U.S. at 690-91, 104 S.Ct. at 2065-66, 80 L.Ed.2d at 695). However, "strategy decisions made after less than complete investigation are subject to closer scrutiny." Ibid. Counsel's failure to make "reasonable investigations or to make [] reasonable decision[s] . . . will render the lawyer's performance deficient." Ibid.
With regard to the satisfaction of the second prong, that is, that defendant was prejudiced by the actions of his or her counsel, the Strickland Court held that there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; see also, Fritz, supra, 105 N.J. at 52, 519 A.2d 336. The reviewing court's principal focus "must be on the fundamental fairness of the proceeding whose result is being challenged." Id. at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. The Court, however, also added that when the errors of counsel are so substantial that "no amount of showing of want of prejudice could cure it" it is unnecessary for a defendant to demonstrate prejudice. U.S. v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657, 668 (1984). As a matter of State law, our Supreme Court has said, "if counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated." Savage, supra, 120 N.J. at 615, 577 A.2d 455.
The facts as described above make clear that the conduct of B.H.'s counsel during the hearings was reasonable and that her claim of ineffective assistance should fail. First, in evaluating the performance prong of the Strickland test, there is no indication that counsel exercised anything but reasonable professional judgment in making strategic decisions and comprehensive arguments on B.H.'s behalf. Her counsel appeared at every proceeding and articulately advocated her client's positions.
B.H.'s claim that counsel prejudiced her by failing to introduce certain testamentary evidence carries little merit. She posits that her three children and their grandmother should have been placed on the stand as they allegedly witnessed or heard of the events that transpired on April 26, 2005. However, there is nothing in the record that suggests counsel did not consider placing these witnesses on the stand. Nor was there any indication in the record that the trial court would have needed to consider testimony from these parties in making its decision.
Indeed, throughout B.H.'s testimony, B.H. spoke for the children in several instances. For example, she admitted that E.F. had an injury near his eye, but that she did not know about it until the day afterwards because neither E.F. nor any of the children ever told her about the welt. B.H. also spoke for the children when she said that she rarely hit them, and that the reason E.F. was hit on the subject night was because he did not do well on his report card, confirming E.F.'s allegations on the DYFS reports. Thus, it is unclear how B.H.'s case would have benefited if the children testified.
*80 B.H. also complained that her counsel did not permit the children's maternal grandmother to testify. However, it is likewise doubtful that placing the children's grandmother on the stand to testify would have positively advanced her case. Indeed, the grandmother previously gave a statement to a DYFS worker that she witnessed B.H. hit the children. If the crux of the grandmother's testimony was that she observed her daughter hitting her children, counsel's decision not to place her on the stand was a reasonable one and in fact, prevented possible prejudice.
B.H. also complains that counsel should have called DYFS workers to testify at trial and should not have relied solely upon the reports presented at trial. It should be principally noted that our courts have found DYFS reports to be reliable and admissible evidence. In In re Cope, we held:
[DYFS] should be permitted to submit into evidence, reports by Bureau staff personnel (or affiliated, medical, psychiatric, or psychological consultants), prepared from their own first-hand knowledge of the case, at a time reasonably contemporaneous with the facts they relate and in the usual course of their duties with the Bureau. Reports of this type, prepared by the qualified personnel of a state agency charged with the responsibility for overseeing the welfare of children in the State, supply a reasonably high degree of reliability as to the accuracy of the facts contained therein. The parent remains free to offer evidence contradicting any statements present in such reports, and, of course, the trier of the facts may in his discretion call for live testimony on any point.
[106 N.J.Super. 336, 343-44, 255 A.2d 798 (App.Div.1969).]
More recently, our court affirmed the reliability and authenticity of DYFS reports. See Div. of Youth and Fam. Servs. v. J.T., 354 N.J.Super. 407, 414, 807 A.2d 270 (App.Div.2002), certif. denied, 175 N.J. 432, 815 A.2d 478 (2003). Such reports are also admissible as regularly-kept business records pursuant to N.J.R.E. 803(c)(6) and are specifically permitted to be submitted as prima facie evidence under R. 5:12-4(d). Moreover, N.J.S.A. 9:6-8.46(a)(3) permits the introduction of "any writing, record or photograph . . . made as a memorandum or record of any condition, act, transaction, or occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency" as evidence of the event. N.J.S.A. 9:6-8.46(a)(4) additionally allows "previous statements made by the child relating to any allegations of abuse or neglect" to be admissible as evidence.
B.H.'s counsel therefore, did not err in relying predominantly upon the DYFS reports and not calling workers or agents to testify; this trial strategy was permitted. Indeed, from the contents of those reports, it is doubtful that having testimony from the Division would assist B.H.'s cause.
B.H. also submits that no medical testimony was presented with regard to E.F.'s injury. There is no indication in the record that B.H.'s counsel neglected to consider submitting such medical information. However, B.H. admitted during her own testimony that E.F. sustained an injury near his eye. Thus, there was no doubt that an injury existed. It is unclear that the court would have needed more detailed medical evidence to render a decision on the issue of abuse or neglect.
As to the remaining documentary proofs that B.H. claims should have been submitted, such as pictures of E.F.'s injury, B.H. has not proven that this information would have been helpful to her *81 cause. Thus, the court should give deference to counsel's decision not to submit such information since "[m]atters of trial strategy are `entrusted to the sound discretion of competent trial counsel.'" V.K., supra, 236 N.J.Super. at 258, 565 A.2d 706 (citing State v. Coruzzi, 189 N.J.Super. 273, 321, 460 A.2d 120 (App.Div.), certif. denied, 94 N.J. 531, 468 A.2d 185 (1983)).
As to the second prong of the Strickland analysis, that is, prejudice, there is no indication that counsel erred or deprived B.H. of a fair trial. Had counsel introduced much of the evidence now desired by B.H., it is unlikely that such proofs would have altered the court's reasoning or resulted in a different outcome. The court rendered its decision based not only upon the DYFS reports, but also significantly upon B.H.'s own testimony, which the trial judge found to be incredible and fabricated "after the fact." Thus, it was B.H.'s own testimony that prejudiced her cause, not the action or inaction of her counsel.
Additionally, it cannot be denied that B.H. was afforded a fair hearing and a full opportunity to make her case. B.H. testified on her own behalf and admitted that she "beat" her kids, though infrequently. The trial judge allowed B.H. to reenact her version of the events of April 26, 2005, and at no time in the record did the court forbid her from speaking. B.H. therefore, did not suffer any prejudice by her counsel or by the court.
This is a case where counsel was presented with difficult proofs, an adamant party, and the obligation to make the most effective trial strategy decisions available. The record demonstrates that counsel did just that, and represented her client effectively. Lastly, there is no indication of plain error on the part of counsel or the trial court. Accordingly, we affirm the thoughtful and well considered judgment rendered by Judge Kyran Connor.
[Parts II & III concerning separate and discrete issues have been redacted from the published opinion. See R. 1:36-2(d)].
NOTES
[1] Although we by no means encourage defense counsel in DYFS matters to refrain from raising other important issues at the trial level.