# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1108-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PEMANENCY,

     Plaintiff-Respondent,

v.

M.S-B.,

     Defendant-Appellant,

and

T.B.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.S.,
a minor.

_____

Submitted September 27, 2021 – Decided October 25, 2021

Before Judges Rothstadt and Mayer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0173-20.

Joseph E. Krakora, Public Defender, attorney for appellant (Dianne Glenn, Designated Counsel, on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant M.S-B. (Moira)[1] appeals from a December 1, 2020 order terminating her parental rights to her son A.S. (Adam), who was born in 2016, and awarding guardianship to plaintiff, the Division of Child Protection and Permanency (the Division). The Division removed the child after local police found defendant and Adam living in a car for at least five days, even though they had a place to stay with defendant's mother, J.S. (Jennifer), with whom Adam has been living and who is now pursuing Adam's adoption. Judge

---

[1] To protect privacy interests and for ease of reading, we use initials and pseudonyms for the parties and the children. R. 1:38-3(d)(12).

Francine I. Axelrad presided over the trial, entered the guardianship judgment, and rendered a thoughtful and comprehensive oral decision that she placed on the record before entering the judgment under appeal.

On appeal, Moira argues Judge Axelrad's determination that the Division proved each prong of the best interests test under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence was in error. She also contends for the first time that the judge "denied [Moira's] due process protections in both the protective services litigation and the guardianship proceedings when [the court] held hearings in her absence and denied her access to a lawyer . . . prior to the guardianship trial." We are unpersuaded by these contentions and affirm substantially for the reasons stated by Judge Axelrad in her comprehensive oral decision.

Moira is the mother of Adam[2] and his four siblings, a twenty-year-old sister and three brothers ranging from ten to twenty-two years old. Jennifer has sole custody of the minor children, except Adam, but, as noted, he was placed in his grandmother's care by the Division through most of this litigation.

---

[2] The trial judge entered a default judgment against Adam's father, T.B. who did not appear in the litigation and who has not filed an appeal from the judgment.

We need not repeat here the facts found by the trial judge. The evidence of Moira's inability to care for Adam, provide him with a safe home, or even to maintain a constant presence in his life is set forth in detail in Judge Axelrad's oral decision that spans sixty-three transcript pages. So too are the details of what are clearly, albeit undiagnosed and untreated,[3] mental health issues that prevent Moira from safely parenting Adam despite their mutual affection for each other, as well as the evidence of Adam's flourishing in the care of his grandmother and the company of his siblings.

Based on her findings from the credible testimony presented by the Division's representative and its expert, Judge Axelrad found that the Division met all four prongs of the "best interests of the child" standard enumerated in N.J.S.A. 30:4C-15.1(a). Specifically, as to the first prong, the judge held that the Division established by clear and convincing evidence that Adam's health and safety were endangered when Moira placed Adam in risk of harm by sleeping in a car for five days when they had a safe home to live in, and then continued to place him at risk of harm by her failure to address her apparent mental health issues despite the Division's efforts to provide her with services.

---

[3]  Moira was evaluated in the Title Nine action but the mental health professionals' diagnosis was not testified to at the guardianship trial.

As to the second prong, Judge Alexrad found that the Division established by clear and convincing evidence that Moira was unwilling to remove the risks to Adam's health and safety. Specifically, the judge found that "[Moira] attended only limited sessions of therapy, and up through her testimony at trial has consistently stated that she didn't need the services, doesn't want the services, [and] has refused to cooperate with the Division for services."

On the third prong, Judge Alexrad held that the Division established by clear and convincing evidence that it had provided reasonable efforts to reunify Moira and Adam. The judge also found from the Division's witness's unrefuted testimony "that [Jennifer] wants adoption over [Kinship Legal Guardianship (KLG)], because she realizes that she needs to be the parent in control and to provide this child the finality, and permanency, and stability that she can't if [Moira] is stepping in and out . . . of his life."

Under the fourth prong, Judge Alexrad held that the Division established by clear and convincing evidence that in "balancing the two relationships" and considering the entire trial record that Adam "will not suffer a greater harm in termination of ties with his mother, [than] from the permanent disruption of his relationship with [Jennifer,] his maternal grandmother." The judge recognized the love between Moira and Adam but noted that "it's clear that [Adam] can't be returned to [Moira]" because he "needs permanency and stability." She further

found that Moira is "unable to provide that, perhaps in large part, based on her mental illness."

Despite not having the benefit of expert testimony about Moira's mental health issues due to her failure to cooperate with evaluations, Judge Axelrad concluded that the Division demonstrated by clear and convincing evidence from the Division's records that were admitted into evidence, without objection, that Moira was "diagnosed with [psychosocial] problems" and that providers that conducted the psychological and psychiatric evaluations during the Title Nine proceedings recommended therapy and medication management. The judge found that while she "do[es] not have expert testimony of a psychologist, because [Moira] chose not to be evaluated by the Division's expert for psychological evaluation or a bonding evaluation," in this action, it is "clear that mental health is an issue." Though without an evaluation she could not make a specific finding that Moira could not meet Adam's needs in the future, she noted that she was able to "find based on the record" the "Division's significant concern[s] with [Moira's] mental health . . . housing and employment" instability. In addition, the judge's own assessment of Moira's testimony, which she found was "for the most part was rambling," indicated that the Division's concerns were warranted. For instance, the judge noted that Moira "didn't answer questions, she was unfocused [and] the longer she testified, [the] more

6

pronounced [was Moira's] pattern of constant repetition of the question, or one word of the question, and then responding with a non-sequitur." The judge believed that Moira was not "trying to be evasive," but found her responses to be "childlike, simplistic, [and] disconnected."

Our review of a trial judge's decision in these cases is limited. We defer to her expertise as a Family Part judge, Cesare v. Cesare, 154 N.J. 394, 412 (1998), and we are bound by her factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007); see also N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012) ("It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights."). After reviewing the record, we conclude that the trial judge's factual findings are fully supported by the record and, in light of those facts, her legal conclusions are unassailable.

We do not reach our decision lightly as we recognize parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). But, that right is not absolute. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Fam. Servs.

v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

The Legislature created a test to determine when it is in the child's best interests to terminate parental rights. To terminate parental rights, N.J.S.A. 30:4C-15.1(a) requires the Division to prove four prongs by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from [her] resource family parents would cause serious and enduring emotional or psychological harm to the child;[4]
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement

_____

[4] We are aware that on July 2, 2021, the Legislature enacted L. 2021 c. 154, deleting the last sentence of N.J.S.A. 30:4C-15.1(a)(2). This amendment does not impact our judgment as we conclude, as Judge Axelrad did, the Division advised Jennifer about KLG as an option and despite that advice, she preferred adoption.

8

outside the home and the [judge] has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11.

Under the first prong of the best interests test, the concern is not only with actual harm to the child but also the risk of harm. In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999). The focus is not on a single or isolated event, but rather on the effect "of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. A judge does not need to wait "until a child is actually irreparably impaired by parental inattention or neglect" to find child endangerment. D.M.H., 161 N.J. at 383. For example, the deprivation of a stable and safe home causes a child psychological harm. See K.H.O., 161 N.J. at 353; D.M.H., 161 N.J. at 379. Also, a parent's withdrawal of nurture and care for an extended period endangers the health of a child. D.M.H., 161 N.J. at 379. When children "languish in foster care" without a permanent home, their parents' "failure to provide a permanent home" may itself constitute harm. Id. at 383 (citation omitted).

Although "[m]ental illness, alone, does not disqualify a parent from raising a child," when a mental illness causes risk of harm, such as the inability to maintain a safe environment, and the parent is unwilling or incapable of

9

obtaining appropriate treatment, the first prong can be proven. F.M., 211 N.J. at 450-51. "'The fact that the parent[ is] morally blameless in this unfortunate situation is not conclusive on the issue of permanent custody. [Her] inadequacy as [a] parent[] stems from [her] mental illness. . . . N.J.S.A. 30:4C-15(c) speaks to the 'best interests of any child,' not the presence or absence of culpable fault on the parents' part.'" N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 439 (App. Div. 2001) (final alteration in original) (quoting In re Guardianship of R., G. & F., 155 N.J. Super. 186, 194-95 (App. Div. 1977)).

"[T]he second prong more directly focuses on conduct that equates with parental unfitness." D.M.H., 161 N.J. at 379 (citations omitted). "[T]he [first] two components of the harm requirement . . . are related to one another, and evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." Ibid. Under the third prong, "[r]easonable efforts may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." M.M., 189 N.J. at 281 (internal quotation marks and citations omitted).

The fourth and last prong is a failsafe that requires the trial court to find, "whether, after considering and balancing the two relationships, the child will

10

suffer a greater harm from the termination of ties with [the] natural parents than from the permanent disruption of [his] relationship with [the resource] parents." K.H.O., 161 N.J. at 355. "This criterion is related to the first and second elements of the best interest standard, which also focus on parental harm to the children." D.M.H., 161 N.J. at 384 (citations omitted.) "The latter specifically defines 'harm' as 'includ[ing] evidence that separating the child from his [resource] parents would cause serious and enduring emotional or psychological harm to the child.'" Ibid. (first alteration in original) (citations omitted).

In establishing the fourth prong, the Division "should offer testimony of a 'well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both the natural parents and the [resource] parents." M.M., 189 N.J. at 281 (citation omitted). However, the lack of a bonding evaluation is not fatal where termination "was not predicated upon bonding, but rather reflected [the child's] need for permanency and [the parent's] inability to care for him in the foreseeable future." N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996).

The four prongs of the test are "not discrete and separate" but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved

11

in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Children of L.A.S., 134 N.J. 127, 139 (1993)).

With these guiding principles in mind, we turn to Moira's challenges to the termination of her parental rights. Moira's argument on appeal about prongs one and two are unpersuasive because, as the trial judge correctly found, the record and Moira's own testimony demonstrated that Moira subjected Adam to unnecessary risk of harm. For instance, she testified that after leaving Jennifer's house, she attempted to rent an apartment or house from a former landlord, but only had approximately $500 in the bank. At some point, Moira recognized that she and Adam were tired and that while she was "between [Jennifer's] house and another close family member," instead of going to either home, she "decided" that "the park would be someplace safe to rest" because "it was well lit." She then testified that the police did a "normal routine stop," while she was parked at the park and, as the trial judge correctly noted during her testimony, Moira only expressed "concerns about why [she] was being told [that] the car wasn't registered" but not about sleeping in a car with a toddler, who was found wearing clothes saturated by his own urine.

12

Moreover, despite the Division's repeated efforts to assist Moira in overcoming the obstacles to her being able to properly care for Adam, Moira not only refused to accept that she was in need of assistance, but she absented herself from not only the Division's representatives, but also from Adam, culminating in her sudden relocation to Georgia without notifying her mother where she was or remaining in meaningful contact with Adam. Moira's behavior demonstrated that she had no intention of making herself available to Adam at any time in the future.

Regardless of whether her mental health was the cause of her behavior, Moira would not and could not provide safe and secure shelter for Adam or accept assistance from her mother or the Division. Under these circumstances, we conclude Judge Axelrad correctly determined the Division met its burden as to the first two prongs. K.H.O., 161 N.J. at 352-53 (holding that prongs one and two may be satisfied by demonstrating "parental dereliction and irresponsibility, such as the parent's . . . inability to a stable and protective home" or support for the child).

As to the third prong, Moira generally argues the record fails to establish by clear and convincing evidence that Division adequately informed Jennifer about KLG being an option, rather than adoption, especially since a written acknowledgment of being advised about KLG signed by Jennifer was never

13

introduced into evidence. Moira's argument in this regard was not raised before Judge Axelrad. For that reason, we do not consider it properly raised before us. See N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 339 (2010) (explaining "issues not raised below will ordinarily not be considered on appeal"). Even if we did, we would conclude that the failure to have Jennifer sign a Division "Acknowledgement of Receipt of Adoption/KLG Fact Sheet," or form CP&P 4-18, does not outweigh the unrefuted, unchallenged testimony that the trial judge found credible from the Division's representative about advising Jennifer about KLG, and from the same witnesses and the Division's expert who evaluated Jennifer's bond with Adam, about Jennifer's wanting to adopt Adam.

Under these circumstances, KLG with Jennifer was never an option for Adam because at that time it was only available "where adoption is neither feasible or likely.[5]" N.J.S.A. 3B:12A-1(c). See also N.J. Div. of Youth & Fam. Servs. v. M.M., 459 N.J. Super. 246, 259 (App. Div. 2019) (stating that the Legislature enacted N.J.S.A. 3B:12A-1 to -7, the KLG Act, because it

---

[5] L. 2021 c. 154 also amended the laws pertaining to the KLG Act by deleting "and (b) adoption of the child is neither feasible nor likely" under N.J.S.A. 3B:12A-6(d)(3), effective immediately. Because Judge Alexrad found that Jennifer was informed about KLG but wants to adopt, the trial judge's findings and conclusions are unaffected by this amendment to the KLG Act.

"recognized than an increasing number of children who cannot safely reside with their parents are in the care of a relative or family friend <u>who does not wish to adopt the child or children</u>." (emphasis added)).

As to the fourth prong, although Moira does not challenge Judge Axelrad's acceptance of the Division's expert's conclusion that Adam was closely bonded to his grandmother and his separation from her would be harmful, she contends that it was impossible for the judge to conclude that disrupting that relationship would not cause more harm than good, because there was no expert opinion as to Moira's bond with Adam, and other evidence raised an inference that her bond with her child was equally as strong as her mother's with Adam.

We find Moira's contention to be without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E). Suffice to say, the only reason there was no bonding evaluation between Moira and Adam was due to her failure to cooperate and the other evidence in the record demonstrated how Moira would leave her son for extended periods of time without any contact for months, for example when she relocated to Georgia, and did nothing to provide him with a safe home or essentials for his daily living. Significantly, although there was no dispute separating Adam from Jennifer would cause him harm, there was no evidence that Moira would be able to comfort Adam or otherwise mitigate that harm.

15

Finally, Moira argues for the first time that her due process rights were violated when she was denied access to counsel during the Title Nine and Title Thirty proceedings and that the Title Nine court placed Adam in Jennifer's care without her knowledge during the May 15, 2019 FN hearing, which despite having notice, Moira failed to appear. She also contends that the judges were impatient, discourteous, and demonstrated "a bias that called into question the fairness of the trial." Further, Moira claims that the Title Nine judge incorrectly informed her that the "pool attorney" that was previously assigned would be assigned again to represent her during guardianship proceedings.

We need not consider Moira's contentions about the Title Nine action as she never appealed from any order entered in that action. To the extent that they arise from her perception of what occurred during the guardianship action, Moira never raised them at her trial before Judge Axelrad. Here again we "'decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" N.J. Div. of Youth & Fam. Servs. v. B.H., 391 N.J. Super. 322, 343 (App. Div. 2007) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)). We find no reason to apply the exception to this rule especially because it relates to the Title Nine proceeding. R. 2:11-3(e)(1)(E).

Even if we did consider Moira's argument, we conclude it is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

In sum, we conclude Judge Axelrad's decision here upheld our public policy that, "[a] child cannot be held prisoner of the rights of others, even those of [the] parents. Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). "'Keeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law.'" N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 484 (App. Div. 2012) (quoting A.G., 344 N.J. Super. at 418).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1108-20