**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0080-13T3

NEW JERSEY DIVISION OF
YOUTH AND FAMILY SERVICES,[1]

     Plaintiff-Appellant,

v.

S.H. and M.H.,

     Defendants-Respondents.

_____

IN THE MATTER OF S.H., a minor.

_____

<table>
<tr><td>

**APPROVED FOR PUBLICATION**

**January 23, 2015**

**APPELLATE DIVISION**

</td></tr>
</table>

     Submitted December 15, 2014 — Decided January 23, 2015

     Before Judges Sabatino, Guadagno, and Leone.

     On appeal from the Superior Court of New
     Jersey, Chancery Division, Family Part,
     Union County, Docket No. FN-20-80-13.

     John J. Hoffman, Acting Attorney General,
     attorney for appellant (Andrea M. Silkowitz,
     Assistant Attorney General, of counsel; Mary
     C. Zec, Deputy Attorney General, on the
     brief).

___

[1] Effective June 29, 2012, the Division of Youth and Family
Services was renamed the Division of Child Protection and
Permanency.  L. 2012, c. 16. (hereinafter the Division).

Joseph E. Krakora, Public Defender, attorney for respondent S.H. (Deric Wu, Assistant Deputy Public Defender, on the brief).

Joseph E. Krakora, Public Defender, attorney for respondent M.H. (Catherine Reid, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor S.H. (Lisa M. Black, Designated Counsel, on the brief).

The opinion of the court was delivered by

GUADAGNO, J.A.D.

We are asked again to determine when a parent's use of corporal punishment exceeds the boundaries of acceptable discipline and enters the proscribed area of child abuse. This perplexing issue is further complicated when the parents are confronted with a child who suffers from behavioral issues. The strain of dealing with an oppositional child can exact a toll on parents and occasionally lead to a reaction where the child is harmed. This case presents such a scenario.

In response to a profanity-laced outburst by her then fifteen-year-old son, S.H. (Scott),[2] defendant S.H. (Susan) initiated a physical altercation with Scott which began with throwing a shoe at him and progressed to hitting him with her hands, striking him with a golf club, and biting him on his

---

[2] We employ pseudonyms to protect the privacy of the minors and for ease of reference.

A-0080-13T3

shoulder.  The Division intervened and sought a finding of child abuse against Susan and her husband, M.H. (Mark).

After a fact-finding hearing, the Family Part found that the parents did not abuse or neglect Scott.  Rather, the judge found that Scott had provoked his mother and that her actions in striking and injuring him were therefore justified.

The Division appeals the decision as to Susan only and argues that the judge erred in concluding that she did not abuse her son.  The Law Guardian agrees with the Division that Susan abused Scott by inflicting excessive corporal punishment.  For the reasons that follow, we reverse.

## I.

Scott is the youngest of three children born to Susan and Mark.  In 2012, Scott lived at home with his parents[3] and two older sisters, Sa.H. (Sara), then age twenty-one, and So.H. (Sophie), then age nineteen.  On Monday, December 10, 2012, Scott was at home sitting on a couch watching television when Sara noticed that several personal items were missing from her room, including a watch, sunglasses, a necklace, two gold rings, and two gold chains.  Sara told Susan about the missing items, and Susan confronted Scott.

---

[3] Mark also resides in Delaware but returns to the New Jersey home when his work permits.

Scott got up from the couch and angrily responded to Susan, "Why the fuck you always blaming me for something?"  Susan then threw a shoe with a heel at Scott.  When Susan threw a second shoe at him, Scott deflected it.  Scott tried to walk away, but Susan grabbed him and began to hit him with her hands.  When Scott again attempted to leave, Susan held him back.  Eventually, Susan grabbed a golf club and began hitting Scott's legs with it.  During the confrontation, Susan yelled, "I told you to stop disrespecting me."  Scott yelled back, "Get the fuck off of me."  When Scott took the first golf club away from Susan, she grabbed another, which Scott also took.  During the struggle, Susan bit Scott at least three times on the back.[4]  Mark entered the room and attempted to intervene.  He later called the police.  Before Scott left the home, he kicked several windows, breaking two of them.

Later that day, Susan put Scott's bed, his clothing, and some of his possessions outside of the home.  Scott did not return to the home for two days.  During this time he did not

---

[4] Scott stated to a Division caseworker that Mark bit him and tried to hit him, and that Susan bit him while he was struggling with Mark.  Sara testified that Mark did not become involved physically, and that Susan bit Scott.  The trial court credited Sara's version of these events, under which Mark was not involved in the assault, and Susan was the only person biting Scott.  As the doctor found three separate bite marks on Scott, the court's finding leads to the conclusion that Susan bit Scott three times.

A-0080-13T3

eat or sleep, and, with no place to stay, he "walked the streets."

When Scott returned home on December 12, 2012, a police officer was there. After Scott spoke with the officer, she left without taking any action. Scott slept on the couch that night and on Thursday, December 13, 2012, he returned to his high school. Before leaving the home that morning, Mark gave Scott money to buy lunch.

Scott had been diagnosed with attention deficit/ hyperactivity disorder (ADHD) and was enrolled as a special education student in his high school's Behavior Disability Program. Scott's high school developed an individualized education program (IEP)[5] for him, and the school's behaviorist, Alece Dickerson, was assigned as his case manager.

On December 13, 2012, one of Scott's teachers informed Dickerson that Scott had bruises, scratches, and bite marks. Dickerson spoke with Scott and observed three large bite marks on his left shoulder and contusions and swelling on his left

---

[5] An IEP is a comprehensive written plan developed by a team consisting of the student's parents, teachers, and representatives of the local educational agency. 20 U.S.C.A. § 1414(d). The IEP's ultimate purpose is to tailor the educational services in order to meet the special needs resulting from the student's disability and to ensure that the student receives the benefits of free appropriate public education. 20 U.S.C.A. §§ 1412(a)(1), (4).

shin and knee.  After consulting with the school nurse, Dickerson called the Division and reported the incident.

Caseworker Sharece Mitchell responded to the high school that afternoon.  She observed and photographed Scott's injuries and conducted an extensive interview.  In addition to describing the events of December 10, 2012, Scott informed Mitchell that he had been disciplined "with belts and other items around the home" since the age of eight, but the corporal punishment had ended approximately two years before, once he was big enough to fight back.  Scott explained that currently, he is disciplined by his parents by being put out of the house.

Mitchell then contacted Susan, who refused to come to the high school to discuss the matter.  Mitchell drove Scott home and, upon seeing the caseworker, Susan raised her hands in the air and stated, "[T]ake me to jail."

Mitchell attempted to discuss a family plan to address the problems with Scott, but Susan simply stated that she "is done with [Scott]."  Mitchell told Susan that Scott's injuries required medical attention, but Susan replied that Scott is grown and if he needs medical attention, he can take himself to the hospital.  Despite Mitchell's urging, Susan refused to engage in any discussion of the December 10, 2012 incident,

Scott's injuries, appropriate Division services, or a plan moving forward.

When Mitchell stepped outside to consult with her supervisor, Scott overheard a conversation between Susan and one of his sisters. The sister told Susan, "[H]e called DYFS on us." Susan replied, "I should've broke his leg." Scott relayed the conversation to Mitchell and said he had to get out of the home.

When Mitchell attempted to reengage Susan about seeking medical attention for Scott's injuries, Susan said that both Mitchell and Scott had to leave the home. As the caseworker left with Scott, Susan told Mark, "I told [Mitchell] to take him. I'll go to court. They think they can do better, let them take him and see."

Mitchell took Scott to a hospital, where he was diagnosed with human bites, lower leg contusions, and swelling on his shin. He was prescribed antibiotics for the bite wounds, and was placed in a shelter that night.

On December 14, 2012, Mitchell again attempted to discuss a plan for the family with Susan to no avail. Susan stated that she had "slept like a baby" the night before, and was no longer "doing anything for" or "worrying about" Scott.

A-0080-13T3

On December 17, 2012, the Division filed a complaint and was granted custody of Scott. On December 31, 2012, Mitchell contacted Susan to attempt to schedule a meeting to discuss services and a reunification plan. Susan again refused, repeating several times that she "is not doing anything" for Scott. Susan did state that Scott could return home if he wanted to, but Scott initially refused and remained in a foster placement. He later reconsidered and was permitted to return home in May 2013.

The Division sought findings of abuse or neglect against both parents. A fact-finding hearing was conducted over three days in April and May 2013. The Division called caseworker Mitchell and Alece Dickerson. Susan called her daughters Sara and Sophie.

The judge issued an oral decision concluding that neither parent had abused or neglected Scott, and that Susan's actions did not rise to the level of abuse. The court found that Scott's use of profanity "provoked" Susan's acts, which were therefore justified:

> I think a mother being cursed at with the F word when she approaches [her] son who is lying on the couch continuing behavior that has been problematic to her otherwise stable and happy family and is confronted with the F word spoken to her face has a right to be angry, or has a — understandably can be angry at that. And that just might be a

trigger that could set someone off, that would set her to throw something like a shoe.

She — I look [at] that provocation and I look at what she was clearly dealing with with [Scott's] behavior, him not coming home, with him being constantly disrespectful to her, to him cutting school, to causing all kinds of problems. Apparently . . . this was something she was unaccustomed to . . . because her daughters, at minimum, finished high school without causing any trouble. And so she was provoked.

The judge concluded that Dickerson's referral of Scott's injuries and the subsequent response by the Division was a "second provocation" of Susan by Scott. The court dismissed Susan's comment that she should have broken Scott's legs as "someone speaking in anger and speaking in frustration . . . ."

Although Susan did not testify, the judge appeared to excuse her refusal to cooperate with the Division by finding that she "was annoyed, upset, and embarrassed for a couple of weeks" over the incident. The judge found that at the time of the fact-finding, Susan was "extremely remorseful" and "desperate to engage in services now."

II.

Our review of a trial court's fact-finding function is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). These findings are binding on appeal when supported by adequate,

substantial, and credible evidence.  Id. at 411-12 (quoting Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974)).  That said, our review is less constricted when the "focus is not on credibility but alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom."  N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 112 (App. Div.), certif. denied, 180 N.J. 456 (2004).  Likewise, the trial court's interpretation of the law is not entitled to deference on appeal.  N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 183 (2010) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

A Title Nine inquiry should focus on harm to the child, rather than on the intent of the caregiver.  G.S. v. Dep't of Human Servs., 157 N.J. 161, 180 (1999).  Indeed, a parent is liable for both the intended and unintended harms that result from his or her intentional acts.  Id. at 178.  "Child abuse" thus covers "situations ranging from slight inadvertence to malicious purpose to inflict injury."  Ibid.

"Excessive corporal punishment" is not defined by statute, but is determined on a case-by-case basis.  N.J. Div. of Youth & Family Servs. v. K.A., 413 N.J. Super. 504, 511 (App. Div. 2010), appeal dismissed as improvidently granted, 208 N.J. 355

(2011).  As the trial court relied on K.A., we discuss that case in detail.

In K.A., a mother who was helping her daughter with her homework admitted to striking the child four or five times with a closed fist on her shoulder when the child would not obey her instructions to complete the homework, and then refused to stay in her room when she was sent there for a time-out.  Id. at 505-06.  At the time of the incident, the child was eight years old and had been diagnosed with pervasive development disorder and attention deficit disorder.  Id. at 506.  The child suffered four small bruises and one slightly larger bruise that caused a mild discoloration of the skin.  Ibid.  The mother admitted to striking the child, and explained that "she was very stressed and overwhelmed in caring for [the child] because [her] father worked until approximately nine o'clock in the evening and then took work calls . . . until midnight every night."  Id. at 506-07.

The Division sought a finding of abuse or neglect against the mother.  An administrative law judge found that the Division had not met its burden of proving that the mother used excessive corporal punishment.  Id. at 508.  The Director rejected those findings, concluding that the act of repeatedly hitting the

11

child with a closed fist, with sufficient force to leave bruises, qualified as abuse. Ibid.

The panel reversed, noting that "the force used did not lacerate the child's skin and did not require any type of medical intervention." Id. at 512-13. Because there was no proof of "per se excessive corporal punishment," the panel "examine[d] the circumstances facing K.A. to determine whether striking [the child] five times on the shoulder with a closed fist amounted to excessive corporal punishment." Id. at 512. The panel found that

> K.A. was confronted with a psychologically disruptive child, unable or unwilling to follow verbal instructions or adhere to passive means of discipline such as a time-out. K.A. was alone, without support from either her spouse/co-parent or from other members of her extended family, such as an experienced mother or aunt. Out of sheer frustration, or through an ill-advised impulse, she struck her child five times. These blows, though undoubtedly painful, did not cause the child any permanent harm, did not require medical intervention of any kind, and were not part of a pattern of abuse.
>
> [Ibid.]

The panel also noted that the mother "accepted full responsibility for her actions, was contrite, and complied with Division-sponsored counseling." Ibid.

A-0080-13T3

We find that K.A. is readily distinguishable from the facts herein, primarily due to the nature and extent of the injuries to Scott and the instrumentalities used to inflict them. In N.J. Div. of Youth & Family Servs. v. P.W.R., the Court held that a stepmother's occasional slaps to her sixteen-year-old's face did not constitute excessive corporal punishment as a matter of law because they did not leave any bruises or marks. 205 N.J. 17, 36 (2011). In contrast, excessive corporal punishment was found where a mother used a belt to hit her six-year-old son and left visible welts. N.J. Div. of Youth & Family Servs. v. B.H., 391 N.J. Super. 322, 340 (App. Div. 2007). Similarly, a mother inflicted excessive corporal punishment by beating her daughter with a paddle in the face, arms, and legs. N.J. Div. of Youth & Family Servs. v. C.H., 414 N.J. Super. 472, 476 (App. Div. 2010). In both B.H. and C.H., our conclusions were based on the use of an instrument to hit the child with such force that visible marks were left, the unreasonable and disproportionate parental response, and the fact that the incidents were not isolated but part of a pattern of physical punishment. See B.H., supra, 391 N.J. Super. at 338-40; C.H., supra, 414 N.J. Super. at 481.

Similarly, Susan's undisputed use of golf clubs and her teeth in causing Scott's injuries, along with the resulting

13                                                     A-0080-13T3

trauma, distinguishes this case from the "occasional slap" discipline in P.W.R.  In addition, Scott's use of profanity did not justify Susan's unreasonable and disproportionate response.

We also reject the judge's conclusion that Scott's injuries did not manifest excessive corporal punishment because the Division "did not find that the injuries required immediate attention . . . ."  The Division did not learn of Scott's injuries for three days.  After viewing the bite marks on Scott's back and the bruising to his leg, caseworker Mitchell informed Susan that Scott had "sustained injuries" and asked her if she would be willing to take him to the hospital "to be seen by a doctor."  When Susan refused, Mitchell took Scott to the emergency room at Muhlenberg Hospital.  When Mitchell learned that Muhlenberg was too crowded, she took Scott to the emergency room at Robert Wood Johnson University Hospital.  There he was seen by Dr. Michael Bernstein, who ordered x-rays of Scott's left shoulder, tibia, and fibula.

Dr. Bernstein diagnosed Scott with a contusion of the lower extremity and human bites.  While no fractures were detected, Dr. Bernstein prescribed Augmentin, an antibiotic, and a follow-up visit with a primary care physician within two to three days. The court's conclusion that the Division did not find that Scott's injuries required immediate attention and that the trip

to the emergency room was part of a routine pre-placement physical is contradicted by these facts.

We also reject the court's conclusion that Susan's actions were provoked by Scott. Neither Susan nor Scott testified at the fact-finding hearing and the Family Part judge was left to determine the facts through statements they made to third parties, Mitchell and Dickerson, and the observations of Sara and Sophie. Based on this record, several facts are undisputed: Scott was sitting on a couch watching television when Susan accused him of stealing items from his sister's room. Scott angrily denied the allegations and employed the "f-word" expletive. The use of this profanity apparently prompted Susan to throw two shoes at Scott, strike him in the legs with a golf club, and bite him several times on the shoulder. It is also undisputed that Scott attempted to leave the room but was prevented from doing so by Susan, who grabbed him and attempted to hold him back.

While we do not condone the use of coarse or vulgar language by a child when directed at a parent, we find no evidence in the record that Scott's denial of his mother's accusation, which included a passing expletive, was intended to provoke Susan's actions. Indeed, as the conflict escalated with Susan throwing a shoe at Scott, he attempted to defuse it by

15                                                                    A-0080-13T3

leaving the room. It was Susan who fueled the escalation by grabbing Scott in an attempt to keep him in the room. The assault with the golf club and the biting followed.

The court's conclusion that Scott's "bringing the Division to [Susan's] home" constituted a "second provocation" is unsupported by any facts in the record and inapposite to controlling law. First, it was not Scott who reported the incident to the Division. Dickerson testified that she called the Division after one of Scott's teachers told her of his injuries. Moreover, Dickerson was statutorily obligated to report the injuries to the Division, N.J.S.A. 9:6-8.10, and the Division, in turn, was obligated to investigate the incident. N.J.S.A. 9:6-8.18. The court's suggestion that Scott was responsible for the referral and did so to provoke his mother finds no support in the record.

We also note the incongruity in the court's conclusion that the utterance of a single profanity by Scott justified Susan's assault, while her own statement that she should have broken Scott's legs was dismissed as "someone speaking in anger and speaking in frustration . . . ."

Nor do we find evidence to support the court's conclusion that Susan was remorseful. The record shows the opposite. Susan refused to take Scott to the hospital after being told

16

that Scott's injuries required medical attention; she initially refused to participate in services including counseling; and refused to even meet with the caseworker to discuss reunification. We are especially doubtful as to the court's conclusion that when Susan raised her hands and told the caseworker to "take me to jail," she was somehow expressing remorse.

While Susan ultimately agreed to participate in services and permitted Scott to move back into the house, this did not occur until almost six months after Scott's removal, during which time he lived in a shelter over Christmas and then a foster home. We find little if any evidence to support the court's conclusion that Susan ever expressed remorse or contrition for her actions.

Finally, given the judge's reliance on K.A., we take this opportunity to clarify our understanding of comments made by the K.A. panel regarding the consideration that must be extended to a parent confronted with misbehavior by a child with behavioral disorders.

The panel held that "the trying circumstances which [the mother] was undergoing due to [her child's] psychological disorder" was a factor to be considered in determining whether

the defendant used excessive corporal punishment.  K.A., supra, 413 N.J. Super. at 512.

Similarly, Scott was enrolled in special education classes and by his own admission suffered from ADHD.  As the judge remarked:

> He does appear to me to be a slightly out-of-control kid.  Maybe not even slightly.  He appears to me to be out of control and presenting challenges that the mother is — and father are having difficulty dealing with and clearly are in need of the services of the Division[.]

We do not read K.A. to suggest that the test for determining excessive corporal punishment should be any different when the child has a disability.  While these children may be more difficult to control, present additional challenges to a family, and be unresponsive to traditional forms of discipline, they are entitled to the same protection under Title Nine as non-disabled children.  We read K.A. to hold only that the underlying behavior of a child, with or without a disability, can be a relevant factor among the totality of circumstances in assessing the reasonableness of the parent's response to the child's outburst.  The panel in K.A. found that the child's repeated defiance despite her mother's oral instructions created a trying situation that was relevant in determining the reasonableness of the mother's response.  Here,

Scott's use of profanity did not justify Susan's violent response.

As noted earlier, we defer to the trial judge's finding of the facts, but we owe no deference to the legal conclusion drawn by the judge from those facts. It is here that we part company with the trial judge's decision and conclude that the injuries inflicted on Scott by Susan are sufficient to support a finding of abuse or neglect. Given this finding, we need not consider the Division's contention that Susan abandoned Scott by refusing to have him medically evaluated, and demanding that the Division remove him from the family home.

Reversed and remanded for the entry of an order finding that Susan abused or neglected Scott.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19

A-0080-13T3