RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1139-15T4

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

 Petitioner-Respondent,

v.

D.M.,

 Respondent-Appellant.

_____________________________

 Submitted March 22, 2017 – Decided September 22, 2017

 Before Judges Carroll and Gooden Brown.

 On appeal from the New Jersey Department of
 Children and Families, Division of Child
 Protection and Permanency, Docket No. AHU 13-
 1041.

 Theresa Richardson, attorney for appellant.

 Christopher S. Porrino, Attorney General,
 attorney for respondent (Andrea M. Silkowitz,
 Assistant Attorney General, of counsel; Alicia
 Y. Bergman, Deputy Attorney General, on the
 brief).

 The opinion of the court was delivered by

GOODEN BROWN, J.A.D.
 D.M.1 appeals from an October 1, 2015 final agency decision

of the Department of Children and Families (DCF) issued after a

contested hearing before the Office of Administrative Law (OAL).

DCF affirmed the substantiation of D.M.'s abuse of her adopted

son, D., and ordered that D.M.'s name be placed on the Central

Registry of Abuse/Neglect Perpetrators (Central Registry) pursuant

to N.J.S.A. 9:6-8.11. In so doing, DCF rejected the Administrative

Law Judge's (ALJ) contrary initial decision. Having considered

the parties' arguments in light of the record and applicable legal

principles, we affirm.

 We glean the following facts from the record. In 1998, the

Division of Child Protection and Permanency2 (Division)

substantiated allegations of physical abuse stemming from a

January 14, 1998 altercation between D.M. and D., who was eleven-

years-old at the time. As a result, D.M. was arrested and charged

with aggravated assault, N.J.S.A. 2C:12-1(b)(1), and child

1
 We use initials to protect privacy interests. See R. 1:38-3(e);
see also R. 5:12-4(b).
2
 Pursuant to L. 2012, c. 16, effective June 29, 2012, the Division
of Youth and Family Services became known as the Division of Child
Protection and Permanency. Although the Division's earlier
actions occurred when the Division was still known as the Division
of Youth and Family Services, we refer to the agency under its
current name.

 2 A-1139-15T4
endangerment, N.J.S.A. 2C:24-4(a), which charges were later no-

billed by the grand jury and subsequently expunged.

 Due to defective service of the Division's January 23, 1998

notification of its findings, D.M., who had no prior or subsequent

history with the Division, did not learn of the substantiation

until fifteen years later, when her employer conducted a Child

Abuse Record Information (CARI) check.3 Thereafter, D.M. requested

an administrative hearing to contest the investigative findings.

Although her initial request for a hearing was denied as untimely,

by letter dated October 21, 2013, the denial was rescinded because

of the "service issue" and the matter was referred to the OAL.

 On March 19, 2015, the OAL conducted a one-day hearing, during

which a then-retired Division caseworker testified on behalf of

the Division. D.M. and D. testified on D.M.'s behalf. Documents

were also admitted into evidence, including the Division's

investigative summary, the police report, D.'s medical examination

form, D.'s psychiatric evaluation, D.'s criminal history, D.M.'s

education and job performance records, and a letter terminating

D.M.'s employment.

 At the hearing, the caseworker testified that the Paterson

Police Department referred D.'s case to the Division at 8:49 p.m.

3
 Pursuant to N.J.S.A. 9:6-8.10a, child abuse background checks
are permissible in limited circumstances.

 3 A-1139-15T4
on January 14, 1998, while D.M. was at the police station and

after D. had been transported by ambulance to the hospital. When

the caseworker questioned D.M. at the police station, she admitted

that she had "slapped" or "backhanded" D. "in the nose" after he

returned home from his after-school program one hour late and was

dismissive when she questioned him about his whereabouts.

Dissatisfied with his explanation, she followed him and "continued

to question him" until "he gave her a defiant look." D.M. told

the caseworker that, at that point, "[s]he lost control and began

hitting him[.]" She "beat him or hit him with a broom on his back

and his arms and . . . the broom broke[,]" after which "he ran out

of the house." One of the responding officers informed the

caseworker that the response team recovered a broom from D.M.'s

home that was "broken in three pieces." D.M. admitted to the

caseworker that because she worked with children, "she was worried

about losing her job" and agreed to have D. placed temporarily

with her sister rather than return to her home.

 When the caseworker interviewed D. at the hospital, he

provided a similar account. He confirmed that D.M. "hit him in

the nose with her backhand[,] and it began to bleed." She followed

him into his room while continuing the argument and "grabbed him

by the face[.]" When "he pushed her hand away[,]" she "hit him

with a broom on his right arm, his left arm, [and] his back" and

 4 A-1139-15T4
"he believed that she broke the broom." He then ran from the

house to the police station. The caseworker observed injuries on

D.'s "back" and "arm[,]" as well as "old injuries" on his legs,

which D. attributed to being "hit with an extension cord." D.

seemed relieved to learn that he would be placed with his aunt.

 D.'s treating physician informed the caseworker that the

fresh "injuries on [D.'s] right arm, left arm[,] and back that

were swollen and several centimeters in length were consistent

with being hit with a straight . . . linear broom type . . .

object." D. also had dried blood in his left nostril, but no

swelling of the nose. The physician documented D.'s injuries,

noting that D. reported that his mother had hit him with a broom

handle and punched him in the nose. According to the caseworker,

the Division substantiated physical abuse by D.M. based on D.'s

statement and D.M.'s admission as well as the police and

physician's reports.

 D.'s testimony at the hearing differed from his January 14,

1998 account. During the hearing, D. testified that when D.M.

confronted him on the stairs about returning home late, he "got

. . . frustrated and tried to move past her" but when "she got in

front of [him]" and "blocked" him, he "got angry" and "pushed

her." According to D., when he pushed her, "she went back and

[he] lost it[.]" D. continued,

 5 A-1139-15T4
 I had kicked her but then she tried to get me
 off her and she hit me, like slapped me on the
 head on the side of my face. That is when I
 took off and I ran in the room and I went to
 grab the broom. When I went to grab the broom
 she was still behind me. She said something,
 I don't recall exactly what she said but she
 said something to me and I turned around and
 I tried to hit her with the broom but I missed.
 She grabbed the broom, we tussled for the
 broom for a little bit and then the broom ended
 up snapping. It was . . . an old broom in the
 house. When the broom snapped I realized that
 I was stuck so I ran out of the house.

 . . . .

 I ran out of the housing complex and I ran up
 Summer Street, . . . .

 I was looking for somewhere to hide, because
 I figured I was in trouble. I thought she was
 going to call the police . . . so I ran in the
 backyard but as I ran in the backyard I
 slipped. When I slipped I think it was like
 a truck or a car back there and I hit the car
 but when I hit it I just crawled up under
 there and stayed there for a little bit.

 D. explained that he sustained the injuries when he "slipped

and hit" the car with "the side of [his] face." He testified that

when he came out from under the car, he noticed that his "shirt

was ripped" and his "nose was bleeding." To avoid getting into

trouble, he went to the police station and told an officer that

his mother beat him with a broom and busted his nose. D was

removed, but returned to D.M.'s home about six months later without

any additional incidents.

 6 A-1139-15T4
 In 2013, D. wrote a statement at D.M.'s request recounting

what transpired on the night in question. Contrary to his hearing

testimony, D.'s written statement did not mention that D.M. slapped

him or that he swung the broom at D.M. When confronted with the

inconsistency at the hearing, D. explained that in his written

statement, he had altered his version of the events in order to

mitigate his conduct.

 At the time of the hearing, D. was then twenty-eight years

old and incarcerated for attempted murder and weapons possession.

He testified that he had previously served two juvenile sentences

and was currently serving his third adult sentence. He also

testified that he started undergoing therapy in 1994 when he was

seven or eight-years-old. When questioned, he recalled admitting

to a psychiatrist that he heard "voices that [told him] to do bad

things."

 In her account of what transpired on the night in question,

D.M. testified at the hearing that when D. arrived home late, she

repeatedly questioned him about his whereabouts, and D. suddenly

"lunged into [her]." According to D.M., she backed into a wall,

and D. kicked her, at which point she "slapped him." D.M. followed

D. into his bedroom while scolding him for putting his hand on

her. D.M. testified that "D. had the broom[,] and he started

swinging it at [her] like he wanted to hurt [her] with it." D.M.

 7 A-1139-15T4
"grabbed the broom and [they] tussled" with it until "it broke[,]

and D. ran." D.M. denied hitting D. with the broom and denied

telling the police or the caseworker that she had done so. D.M.

also denied seeing any blood or other injuries on D. The next

time she saw D. was June 11, 1998, when the Division returned him

to her.

 D.M. testified that she had worked in child care for twenty-

eight years. She has a Bachelor's Degree in Early Childhood

Education, a head teacher license, and a director's license, as

well as other licenses and certifications. On June 7, 2013, while

she was out on disability for breast cancer, her employer, the

Michael's Education Center, terminated her employment after a CARI

check revealed the 1998 substantiation for child abuse. According

to D.M., that was the first time she learned about the

substantiation.

 D.M. testified that she has two daughters of her own, but she

and her husband adopted D. in 1990 when he was three-years-old

after the Division removed him from an abusive home. She enrolled

D. in the nursery at the school where she was a kindergarten

teacher. There were immediate complaints about his behavior that

continued with increasing severity as D. grew older. Ultimately,

D. was diagnosed with a "psychotic disorder" and prescribed

medication. His diagnosis was confirmed in 1999 when D. was deemed

 8 A-1139-15T4
eligible for disability benefits following a Social Security

disability hearing. The medical evidence established that he had

a severe psychotic disorder, a conduct disorder, and a severe

cognitive disability. D. was classified and placed in a succession

of different special education programs until he was incarcerated

at the age of twelve.

 After the hearing, an Administrative Law Judge (ALJ) issued

an initial decision on July 14, 2015, reversing the substantiation

of D.M.'s physical abuse of D. and ordering that D.M.'s name be

removed from the Central Registry. The ALJ made factual findings

consistent with the undisputed testimony at the hearing. As to

the disputed account of the January 14, 1998 altercation, the ALJ

rejected D.'s and D.M.'s hearing testimony. Instead, the ALJ

found that D.M. engaged in corporal punishment of D. "which caused

injuries and bruising to his nose, arms[,] and back" by "[striking]

D. on his nose with the back of her hand, causing his nose to

bleed" and "[striking] D. on his back and arms with the broom,

which broke." Nonetheless, the ALJ concluded that the Division

failed to prove by a preponderance of the evidence that D.M.'s

conduct constituted physical abuse as defined in N.J.S.A. 9:6-

8.21.

 Analogizing the facts of the case to the facts in N.J. Div.

of Youth & Family Servs. v. K.A., 413 N.J. Super. 504, 510 (App.

 9 A-1139-15T4
Div. 2010), certif. dismissed as improvidently granted, 208 N.J.

355 (2011), the ALJ explained:

 [D.M.] acknowledged that she had imposed the
 discipline because she was overwhelmed and
 under stress, and D., a child diagnosed with
 a severe psychotic disorder, a conduct
 disorder, and severe cognitive disability,
 came home late again from an after-school
 program, and she was worried. Like K.A., she
 responded out of frustration with her child's
 very long history of psychologically and
 physically disruptive behavior. It is
 undisputed that D. had been medicated since
 the age of ten and was receiving ongoing
 psychological treatment, but his behavior had
 steadily worsened. D.'s behavior was
 undisputedly rebellious and disrespectful.

 Significantly, D.M. immediately
 regretted the nature of the corrective action
 she pursued, and the preponderance of the
 credible evidence established that the
 incident was isolated and aberrational to the
 family. There is no evidence whatsoever that
 D.M. is or was a danger to children in general,
 indeed she went on to work for many years in
 child care, rising to the level of director
 of a child-care center. I am satisfied that
 the record was devoid of any credible evidence
 that D.M.'s behavior created a risk of future
 harm, and through the lens of hindsight we
 know that soon thereafter, D. embarked on a
 course of conduct that has led to multiple and
 continuous incarcerations, lasting to this
 day. The injuries D. sustained did not
 manifest credible evidence of a substantial
 injury, imminent danger, a protracted injury
 or excessive corporal punishment.

 The Division took exception and sought review by the agency

head. On October 1, 2015, the Assistant Commissioner rejected the

 10 A-1139-15T4
ALJ's recommendation of reversal and affirmed the substantiated

finding of abuse, concluding that D.M.'s actions constituted

excessive corporal punishment. The Assistant Commissioner

accepted the ALJ's factual findings. However, the Assistant

Commissioner distinguished K.A., supra, and instead found D.M.'s

case analogous to N.J. Div. of Youth & Family Servs. v. C.H., 414

N.J. Super. 472 (App. Div.), reaff'd on reconsid., 416 N.J. Super.

414 (App. Div. 2010), certif. denied, 207 N.J. 188 (2011). The

Assistant Commissioner then applied the standard adopted in G.S.

v. N.J. Div. of Youth & Family Servs., 157 N.J. 161 (1999) and

N.J. Div. of Youth & Family Servs. v. M.C., III, 201 N.J. 328, 344

(2010) to the ALJ's findings of fact. After considering the

totality of the circumstances, the Assistant Commissioner

concluded that D.M. failed to exercise a minimum degree of care

because she disregarded the substantial probability that injury

would result from her intentional conduct.

 The Assistant Commissioner determined that D.M.'s conduct

qualified as abuse under N.J.S.A. 9:6-8.21(c)(4) "as [D.M.] knew

or should have known that her actions of back handing and hitting

a child with a broom could potentially cause physical injury[,]

and [D.M.] disregarded the substantial likelihood that injury

could result." As the Assistant Commissioner noted, "D.M.'s

actions of hitting D. with her hand and a broom with such force

 11 A-1139-15T4
to have caused that broom to break and injuries to result clearly

amounted to a failure to exercise a minimum degree of care."

Further, although "D.'s injuries were not life-threatening[,]

. . . he needed medical attention" and "[D.M.] was neither

remorseful nor did she have any justifiable reason for hitting

[D.]" The Assistant Commissioner acknowledged that "D. had a

history of behavioral issues and was diagnosed with severe

psychotic disorder, conduct disorder and severe cognitive

disability[,]" but found that this history did not justify D.M.'s

actions because "she had an option to resort to other passive

discipline methods; instead, she chose to follow D. into his room

after having backhanded him in the face and hit him with a broom

causing further injuries." The Assistant Commissioner concluded

that these circumstances were distinguishable from "a slap to a

face of a defiant teenager" countenanced in N.J. Div. of Youth &

Family Servs. v. P.W.R., 205 N.J. 17, 36 (2011). Accordingly, the

Assistant Commissioner indicated that D.M.'s name should remain

on the Central Registry.

 This appeal followed. On appeal, D.M. argues that the

Assistant Commissioner's decision should be reversed because it

is "arbitrary, capricious and unreasonable[.]" Specifically, D.M.

asserts that the Assistant Commissioner "failed to cite with

particularity any new or modified finding supported by competent

 12 A-1139-15T4
and credible evidence in the record[,]" applied an improper

"standard in its analysis of this case[,]" and did not properly

account for the factors articulated in K.A., supra, 413 N.J. at

512. Further, D.M. seeks the removal of her name from the Central

Registry because she asserts the allegation of abuse "was not

properly substantiated."

 Our role in reviewing the final decision of an administrative

agency is limited. In re Taylor, 158 N.J. 644, 656 (1999). We

review administrative decisions to determine whether: (1) the

decision violates express or implied legislative policies; (2) is

unsupported by substantial evidence in the record; and (3) the

agency made a decision "that could not reasonably have been made

on a showing of the relevant factors." In re Proposed Quest Acad.

Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013)

(quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)). While we

accord a "strong presumption of reasonableness" to an agency's

"exercise of statutorily delegated responsibility[,]" City of

Newark v. Nat. Res. Council, 82 N.J. 530, 539, cert. denied, 449

U.S. 983, 101 S. Ct. 400, 66 L. Ed. 2d 245 (1980), we owe no

deference to an agency's interpretation or application of a

statute, if it is contrary to the language of the statute or

"'undermines the Legislature's intent.'" N.J. Div. of Youth &

 13 A-1139-15T4
Family Servs. v. T.B., 207 N.J. 294, 302 (2011) (quoting Reilly

v. AAA Mid-Atl. Ins. Co. of N.J., 194 N.J. 474, 485 (2008)).

 "Absent arbitrary, unreasonable or capricious action, the

agency's determination must be affirmed." C.H., supra, 414 N.J.

Super. at 480 (quoting G.S., supra, 157 N.J. at 170). "The burden

of demonstrating that the agency's action was arbitrary,

capricious or unreasonable rests upon the [party] challenging the

administrative action." In re Arenas, 385 N.J. Super. 440, 443-

44 (App. Div.), certif. denied, 188 N.J. 219 (2006). Where an

agency's expertise is a factor, a court defers to that expertise,

particularly in cases involving technical matters within the

agency's special competence. In re Freshwater Wetlands Prot. Act

Rules, 180 N.J. 478, 488-89 (2004). The court "may not vacate an

agency determination because of doubts as to its wisdom or because

the record may support more than one result," but is "obliged to

give due deference to the view of those charged with the

responsibility of implementing legislative programs." In re N.J.

Pinelands Comm'n Resolution PC4-00-89, 356 N.J. Super. 363, 372

(App. Div.), certif. denied, 176 N.J. 281 (2003).

 "We do not, however, simply 'rubber stamp the agency's

decision.'" N.J. Dep't of Children & Families' Inst. Abuse

Investigation Unit v. S.P., 402 N.J. Super. 255, 268 (App. Div.

2008) (quoting Paff v. N.J. Dep't of Labor, 392 N.J. Super. 334,

 14 A-1139-15T4
340 (App. Div. 2007)). If "there is a clear showing that [the

agency's decision] is arbitrary, capricious, or unreasonable, or

that it lacks fair support in the record[,]" we are obliged to

provide a remedy. K.A., supra, 413 N.J. Super. at 509 (quoting

In re Herrmann, 192 N.J. 19, 27-28 (2007)). There is a

"particularly strong need for careful appellate review" where the

agency's factual findings are contrary to those of an ALJ. In re

Lalama, 343 N.J. Super. 560, 565 (App. Div. 2001).

 The Division is the agency charged with investigating child

abuse and neglect. The regulations in effect at the time of the

investigation required the Division to make a finding that the

allegations were either substantiated, not substantiated, or

unfounded once such an investigation was concluded. N.J.A.C.

10:129-3.3(a).4 A "substantiated" finding was defined as a finding

made "when the available information, as evaluated by the Division

representative, indicates that a child is an abused or neglected

child as defined in N.J.A.C. 10:133-1.3 because the child has been

harmed or placed at risk of harm by a parent[.]" Where the

4
 Effective April 1, 2013, DCF redefined the investigative findings
for "substantiated" and "unfounded" and added two intermediary
investigative findings of "established" and "not established."
See 49 N.J.R. 357(a); 49 N.J.R. 2437(a); 49 N.J.R. 738(a) (April
1, 2013). Additionally, effective January 3, 2017, DCF recodified
its rules from Title 10 to Title 3A. See 49 N.J.R. 98(a) (Jan.
3, 2017). Where applicable, we cite the regulations extant in
1998 when the investigative findings were rendered.

 15 A-1139-15T4
Division's investigation has "substantiated" child abuse or

neglect, the regulations allow for a hearing. N.J.A.C. 3A:5-

4.3(a)(2).

 Under the Administrative Procedure Act, N.J.S.A. 52:14B-1 to-

21, the ALJ conducts a hearing and issues a recommended report and

decision containing recommended findings of fact and conclusions

of law. N.J.S.A. 52:14B-10. The agency is the "primary

factfinder" and has the "ultimate authority, upon a review of the

record submitted by the ALJ[,] to adopt, reject or modify the

recommended report and decision of the ALJ." N.J. Dep't of Pub.

Advocate v. N.J. Bd. of Pub. Utils., 189 N.J. Super. 491, 507

(App. Div. 1983) (citing N.J.S.A. 52:14B-10(c)). "[T]he agency

head may reject or modify findings of fact, conclusions of law or

interpretations of agency policy in the decision, but shall state

clearly the reasons for doing so." N.J.S.A. 52:14B-10(c); see

also N.J.A.C. 1:1-18.6(c). Where an agency head rejects a

recommendation of an ALJ, the basis for rejection must be set

forth with particularity, and new or modified findings must be

supported by sufficient, competent, and credible evidence in the

record. N.J.S.A. 52:14B-10(c).

 A child is considered abused or neglected when "[a parent or]

guardian fails to exercise a minimum degree of care when he or she

is aware of the dangers inherent in a situation and . . . recklessly

 16 A-1139-15T4
creates a risk of serious injury to that child." G.S., supra, 157

N.J. at 181. Failure to exercise a minimum degree of care includes

"the infliction of excessive corporal punishment." N.J.S.A. 9:6-

8.21(c)(4). "Corporal punishment" is not prohibited, but Title

Nine does prohibit "excessive corporal punishment[.]" K.A.,

supra, 413 N.J. Super. at 510.

 While excessive corporal punishment is not defined by the

statute, our case law has come to define "excessive" as "beyond

what is proper or reasonable." Id. at 511. Punishment will be

considered excessive where a parent's intentional act exposes a

child to the substantial probability that injury would result from

the parent's conduct. M.C. III, supra, 201 N.J. at 345. In this

regard, courts focus on "the harm suffered by the child, rather

than the mental state of the accused abuser[.]" K.A., supra, 413

N.J. Super. at 511. Although what constitutes excessive corporal

punishment to sustain a finding of abuse under N.J.S.A. 9:6-

8.21(c)(4) is "generally fact-sensitive" and "idiosyncratic[,]"

P.W.R., supra, 205 N.J. at 33, and the Division bears the burden

of proving a child is abused or neglected by a preponderance of

the evidence, N.J.S.A. 9:6-8.46(b), our Supreme Court has

implicitly found corporal punishment can be excessive where the

discipline results in bruises or marks. P.W.R., supra, 205 N.J.

at 36-37. Further, N.J.A.C. 10:129-2.2(a) lists bruising and

 17 A-1139-15T4
abrasions as injuries that may constitute abuse. See also P.W.R.,

supra, 205 N.J. at 36 (finding that "[a] slap of the face of a

teenager as a form of discipline — with no resulting bruising or

marks — does not constitute excessive corporal punishment"

(internal quotation marks omitted)).

 As we recently observed:

 [E]xcessive corporal punishment was found
 where a mother used a belt to hit her six-
 year-old son and left visible welts. N.J.
 Div. of Youth & Family Servs. v. B.H., 391
 N.J. Super. 322, 340 [(App. Div.), certif.
 denied, 192 N.J. 296 (2007)]. Similarly, a
 mother inflicted excessive corporal
 punishment by beating her daughter with a
 paddle in the face, arms, and legs. [C.H.,
 supra, 414 N.J. Super. at 476]. In both B.H.
 and C.H., our conclusions were based on the
 use of an instrument to hit the child with
 such force that visible marks were left, the
 unreasonable and disproportionate parental
 response, and the fact that the incidents were
 not isolated but part of a pattern of physical
 punishment. See B.H., supra, 391 N.J. Super.
 at 338-40; C.H., supra, 414 N.J. Super. at
 481.

 [N.J. Div. of Youth & Family Servs. v. S.H.,
 439 N.J. Super. 137, 146-47 (App. Div.),
 certif. denied, 222 N.J. 16 (2015).]

 Nonetheless, a single occurrence of corporal punishment may

be deemed excessive if medical intervention is necessary and the

injury was foreseeable. K.A., supra, 413 N.J. Super. 511. For

example, in M.C. III, supra, 201 N.J. at 335, a two-hundred pound

father chased his two teenage children, caught and grabbed them,

 18 A-1139-15T4
and all three ended up on the floor. Both children were injured.

One child sustained a bruised and swollen hand, while the other

had rib tenderness and an abrasion behind the ear. Id. at 335.

Our Supreme Court held that, although the father "may not have

intended to harm his children, his actions were deliberate" and

constituted abuse because he "intentionally grabbed the children

and disregarded the substantial probability that injury would

result from his conduct." Id. at 345.

 In K.A., we reversed a finding of abuse where a mother punched

her eight-year-old, autistic daughter on the shoulder four to five

times with a closed fist, leaving bruises; however, the

circumstances of that case were unique. K.A., supra, 413 N.J.

Super. at 505-06. After examining the reasons underlying the

mother's conduct, "the isolation of the incident[,]" and "the

trying circumstances which [the mother] was undergoing due to [the

child's] psychological disorder," we determined that the mother's

conduct was aberrational and excusable under the circumstances.

Id. at 512. We noted that the child was unwilling to follow verbal

instructions or adhere to passive means of discipline such as a

time-out and

 [the mother] was alone, without support from
 either her spouse/co-parent or from other
 members of her extended family, such as an
 experienced mother or aunt. Out of sheer
 frustration, or through an ill-advised

 19 A-1139-15T4
 impulse, she struck her child five times.
 These blows, though undoubtedly painful, did
 not cause the child any permanent harm, did
 not require medical intervention of any kind,
 and were not part of a pattern of abuse.

 [Ibid.]

In addition, we noted that the mother accepted full responsibility

for her actions and willingly engaged in Division services. Ibid.

 Applying these principles, we conclude that the final agency

decision here is not arbitrary or capricious and does not lack

sufficient evidential support in the record. The Assistant

Commissioner clearly identified adequate grounds to reach a

different regulatory conclusion than the ALJ, based upon the ALJ's

factual findings. We concur with the Assistant Commissioner's

determination that back-handing D. with sufficient force to cause

a nose bleed and striking D. with a broom with enough force to

break the broom and injure D. amounted to excessive corporal

punishment as contemplated under N.J.S.A. 9:6-8.21(c)(4). We

acknowledge, as did the Assistant Commissioner, that D.'s history

of psychiatric and behavioral disorders presented challenges.

Moreover, some of the mitigating circumstances that were present

in K.A. exist here. However, "K.A. is readily distinguishable

from the facts herein, primarily due to the nature and extent of

the injuries to [D.] and the instrumentalit[y] used to inflict

them." S.H., supra, 439 N.J. Super. at 146 (finding that corporal

 20 A-1139-15T4
punishment was excessive where a mother used a golf club and her

teeth on her teenager, causing a contusion and bite marks). Unlike

K.A., D.M. used a broom as well as her hand to discipline D., and

the force she used lacerated D.'s skin, prompting the police to

send him to the hospital for medical intervention.

 Further, we have stated that

 [w]e do not read K.A. to suggest that the test
 for determining excessive corporal punishment
 should be any different when the child has a
 disability. While these children may be more
 difficult to control, present additional
 challenges to a family, and be unresponsive
 to traditional forms of discipline, they are
 entitled to the same protection under Title
 Nine as non-disabled children. We read K.A.
 to hold only that the underlying behavior of
 a child, with or without a disability, can be
 a relevant factor among the totality of
 circumstances in assessing the reasonableness
 of the parent's response to the child's
 outburst.

 [S.H., supra, 439 N.J. Super. at 149-50.]

 We recognize and, indeed, commend D.M. for her exemplary

career in child care and the fact that no incidents were reported

subsequent to the abusive conduct in question. Even so, a parent's

post-incident improvement does not excuse past abuse or neglect,

for case law requires us to look only at the risk of harm as of

the time of the abuse and not at the time of the hearing. See

N.J. Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166,

189 (2015). Although we are very mindful of the negative

 21 A-1139-15T4
consequences to D.M. of being kept on the Child Abuse Registry,

we are unable to conclude that the Assistant Commissioner's

decision to do so on this record is arbitrary, capricious, or

lacking in evidentiary and legal support.

 Affirmed.

 22 A-1139-15T4