# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2102-18T2
                           A-2103-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

G.J-J. and D.A.,

      Defendants-Appellants.

_____

IN THE MATTER OF G.D.,
D.A., JR., B.A., and H.A.,

      Minors.

_____

          Submitted March 18, 2020 – Decided April 8, 2020

          Before Judges Koblitz, Whipple and Mawla.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0455-17.

Joseph E. Krakora, Public Defender, attorney for appellant G.J.-J. (Robyn A. Veasey, Deputy Public Defender, of counsel; Laura M. Kalik, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant D.A. (Robyn A. Veasey, Deputy Public Defender, of counsel; Ilea Anne Kozak, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Sue Arons, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor G.D. (Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendants G.J.-J[1] (Gina) and D.A. (David) appeal from an October 6, 2017 order finding that they abused or neglected G.D. (Gaby), born in 2004, Gina's biological daughter and David's stepdaughter, by inflicting and allowing to be inflicted upon her excessive corporal punishment. We consolidated both appeals. When Gaby returned home from school later than expected, Gina began hitting Gaby with a belt for lying about her whereabouts. David watched, but

---

[1] We use initials and pseudonyms to preserve the privacy of the parties. R. 1:38-3(d)(12).

other than telling Gina to stop, he did not interfere. We affirm the findings against both defendants.

As shown by security footage, the matter escalated into Gina pushing Gaby into a corner of an elevator where she continued to yell at her. Gina proceeded to pull Gaby out of the elevator and bite her arm. Gaby ran to the apartment complex's security booth, and the guards called the police. Although Gina and David attempted to convince Gaby to return home, she refused. The police took Gaby to the hospital and the matter was referred to the Division of Child Protection and Permanency (Division).

During the Division's investigation, D.A. Jr. (David Jr.), born 2010, B.A. (Beatrice), born 2013, and H.A. (Helene), born 2015, David and Gina's biological children, were taken into the Division's custody. While Gina admitted to hitting Gaby with a belt on the day of the incident and on previous occasions, she denied ever biting her. David Jr., Beatrice and Helene were later returned, but Gaby, who did not want to come home, was adopted by relatives living in Canada.

I.

Since the age of two, Gaby lived with her grandparents and other relatives in Haiti. In 2015, she immigrated to the United States to live with Gina, David and her three younger half-siblings.

3

Gina and David repeatedly instructed Gaby that she should walk directly home after school by herself, instead of staying with friends. On April 13, 2017, Gaby arrived home at her usual time of around 4:20 p.m. Because school was dismissed early, Gina expected her earlier. Although Gaby told Gina she came straight home, Gina believed the child was lying and began to hit her with a belt in front of David in the living room of their one-bedroom apartment. Gaby claimed that David also "took [the] belt and hit her once," but, worried that "he [was] going to kill her and get in trouble," he stopped.

To escape, Gaby acted as though she was leaving the apartment to take out the garbage. Upon realizing she had nowhere to go, she returned. Gina did not believe Gaby had gone to take out the garbage, so she and Gaby went into the elevator to go down to the trash room. As the trial court noted, the security footage showed that Gina was "obviously very angry with her child." She had "shove[d] [Gaby] into a corner of the elevator" and as she "pull[ed] the reluctant [Gaby] out [of the elevator], it appears that [she] bit[] the child on the upper arm."

Gaby then ran to the security booth outside her apartment building. She was "visibly shaking, crying, and scared" and told the security guards she did not want to return home. Gina and David arrived at the security booth to convince Gaby to return home, but she refused. The trial court noted that the

4

audio and video footage from the security booth showed David "berat[ing] and interrogat[ing] [Gaby] in a loud, very angry . . . voice," asking her: "What is your problem?"; "What did you take out the house and run away with?"; "Why did you come here?" David even threatened to send Gaby back to Haiti, exclaiming, "My name is on all your documents. So, I can ship you back whenever I want. I will not let you to put me into trouble. I'm done with you. I'm getting all your stuff ready." Gaby remained at the security booth until the police arrived and took her to Newark Beth Israel Medical Center (NBIC).

Division caseworkers arrived at NBIC around midnight to speak with Gaby. Gaby explained what happened that day, confirming that her parents, who always believed she was lying, hit her with a belt when she arrived home from school and her mother bit her. She revealed that she was also hit the week before and that her current relationship with her mother was "[not] that good," describing her as "mean." Gaby said her mother "yells a lot and beats her."

The caseworkers took pictures of Gaby's bruises on both thighs as well as the bite mark on her arm. The doctor reported that while the "biting appears pretty fresh," the bruising on Gaby's legs could have taken place "[a]s recent as [twenty-four] hours ago or up to [three] days ago."

The caseworkers then went to speak to Gina and David at their apartment. Gina admitted she "whopped" Gaby with a belt because she was angry at her for

5

lying, but denied biting Gaby. This was "the [fifth] or [sixth] time she ha[d] hit [Gaby] with a belt." She also acknowledged hitting Gaby with her hand. David explained that while he has physically disciplined Gaby in the past, he stopped doing so for about the past six months "due to his profession" as a doctor in residency. He denied beating Gaby that day and said he verbally instructed Gina to stop beating her.

The caseworkers also interviewed then seven-year-old David Jr. who explained that although he did not witness the events of April 13, his parents have hit him and his sisters Beatrice and Gaby in the past as punishment. He said that Gaby is hit "so badly because she lies a lot."

David Jr., Beatrice, and Helene were taken to NBIC for physical examinations. While David Jr. told the doctor that his parents told him "not to say anything to anyone about who hits him," Beatrice explained that when she gets in trouble, she is "whipped" with a belt. The children were placed in resource homes.

The court initially granted the Division custody of the children, barring Gina and David from unsupervised contact with them. The court returned custody of the three younger children to their parents thereafter. Gaby expressed wanting to live with relatives in Canada, who she previously had lived with in

6

Haiti. In August 2017, Gina was served with a criminal complaint for the abuse or neglect of Gaby.

The court held a three-day fact-finding hearing at which Gina and David were present with counsel. The Division presented the testimony of two caseworkers and introduced into evidence the security footage of what occurred in the elevator and at the security booth. No evidence or witnesses were presented by the defense or the law guardian.

On October 6, 2017, the court in an oral opinion found by a preponderance of the evidence that Gina "failed to exercise a minimum degree of care by unreasonably inflicting excessive corporal punishment" on Gaby and David also "failed to exercise a minimum degree of care by allowing . . . harm or a substantial risk thereof, including infliction of excessive corporal punishment." The same day, the court signed a dispositional order stating that Gaby "shall continue under the custody, care and supervision of the Division, with placement as deemed appropriate by the Division," and David Jr., Beatrice and Helene "shall continue under the care and supervision of the Division; with the Division being authorized to make announced and unannounced visits to the home of the defendants."

A-2102-18T2

A year later, the court approved Gaby's adoption by her relatives in Canada. The order reflected that Gina supported the plan. In December 2018, the court issued an order terminating this litigation.

II.

Our review of a family court's abuse or neglect finding is limited. See N.J. Div. of Youth & Family Servs. v. S.H., 439 N.J. Super. 137, 144 (App. Div. 2015). We must determine whether the decision "is supported by 'substantial and credible evidence.'" N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)).

We defer to the trial court's factual findings, because that court has "the superior ability to gauge the credibility of the witnesses . . . and because it possesses special expertise in matters related to the family." Ibid. Our review is, however, "less constricted when the 'focus is not on credibility but alleged error in the trial court's evaluation of the underlying facts and the implications to be drawn therefrom.'" S.H., 439 N.J. Super. at 144 (quoting N.J. Div. of Youth & Family Servs v. C.S., 367 N.J. Super. 76, 112 (App. Div. 2004)). Ultimately, a family court's decision should not be overturned unless it went "so 'wide of the mark'" that reversal is needed "to correct an injustice." F.M., 211 N.J. at 448 (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88,

104 (2008)). A trial court's interpretation of the law or its legal conclusions are reviewed de novo. State ex rel. A.B., 219 N.J. 542, 554-55 (2014); Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"The purpose animating Title Nine 'is to provide for the protection of children . . . who have had serious injury inflicted upon them.'" N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 31 (2011) (quoting N.J.S.A. 9:6-8.8(a)). Therefore, "[a] Title Nine inquiry should focus on harm to the child, rather than on the intent of the caregiver." S.H., 439 N.J. Super. at 145. Pursuant to N.J.S.A. 9:6-8.21(c)(4), an "[a]bused or neglected child" is

> a child [less than eighteen years of age] whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.

While "[t]he law does not prohibit the use of corporal punishment," and "a parent may inflict moderate correction such as is reasonable under the circumstances of a case," excessive corporal punishment is expressly prohibited. Dep't of Children & Families, Div. of Youth & Family Servs. v. K.A., 413 N.J. Super. 504, 510 (App. Div. 2010). The Division "must prove that the child is 'abused

or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" P.W.R., 205 N.J. at 32 (quoting N.J.S.A. 9:6-8.46(b)).

Each case of alleged abuse "requires careful, individual scrutiny" and is "generally fact sensitive." Id. at 33. Although Title Nine does not define excessive corporal punishment, our court has recognized "'excessive' means going beyond what is proper or reasonable." K.A., 413 N.J. Super. at 511. "[A] single incident of violence against a child may be sufficient to constitute excessive corporal punishment." Ibid.

"[T]he use of an instrument to hit the child with such force that visible marks were left, the unreasonable and disproportionate parental response, and the fact that the incidents were not isolated but part of a pattern of physical punishment" are factors the court may consider when determining whether a child suffered excessive corporal punishment. S.H., 439 N.J. Super. at 146-47.

III.

Gina contends that "[m]any of the mitigating circumstances that were present in K.A., are present here," and therefore, the court should similarly find that her "conduct was aberrational and excusable under the circumstances."

In K.A., a mother struck her eight-year-old daughter four or five times with a closed fist on the shoulder after she refused to complete her homework

and refused to be disciplined by remaining in her room. 413 N.J. Super. at 505–06. Although the child sustained bruises, she did not require medical attention. Id. at 512. We noted that "K.A. was alone, without support from either her spouse/co-parent or from other members of her extended family." Ibid. Additionally, the child was "psychologically disruptive," "unable or unwilling to follow verbal instructions or adhere to passive means of discipline such as a time-out," and "diagnosed with pervasive development disorder and attention deficit disorder." Id. at 506, 512. We reasoned that K.A.'s actions were not excessive in light of "(1) the reasons underlying K.A.'s actions; (2) the isolation of the incident; and (3) the trying circumstances which K.A. was undergoing due to [the child's] psychological disorder." Id. at 512.

IV.

Gina inflicted corporal punishment by biting Gaby and using a belt to hit her for lying. By her own admission, Gina concedes that her use of a belt as a method of corporal punishment was not an isolated incident.

Because Gaby's bruises and marks resulted in no tears to the skin or lacerations nor required medical treatment, Gina notes "[t]he Division simply failed" to established that Gaby was in "an imminent danger to her well-being." Furthermore, Gina asserts the trial court inappropriately speculated from the security footage that Gaby suffered emotional harm.

11

The fact that a child did not sustain physical injuries that required medical intervention does not require a reversal of the court's abuse or neglect finding. See Dep't of Children & Families, N.J. Div. of Youth & Family Servs. v. C.H., 414 N.J. Super. 472, 476 (App. Div. 2010). Gina's response to Gaby arriving home late was excessive. We can imagine no circumstances where biting and hitting a child with a belt is reasonable punishment.

The trial court stated that it could not accept it was Gaby's parents' "concern for her wellbeing that caused this extreme behavior or, perhaps . . . [Gaby's] pattern of lying." In recognizing that the court did not know whether Gaby was lying, it found "there simply is no justification for the kind of physical abuse this child suffered. If there were problems . . . with [Gaby's] behavior, that was not the way to discipline [her] and that was not the way to address them." Although, like K.A., Gina "accepted full responsibility for her actions, was contrite, and complied with Division-sponsored counseling," under the totality of the circumstances, the court did not abuse its discretion in finding that the Division established by a preponderance of the evidence that Gina abused or neglected Gaby. See K.A., 413 N.J. Super. at 512.

V.

David argues that the Division failed to demonstrate by a preponderance of the evidence that he did not exercise a minimum degree of care by failing to

"prevent[] or eliminat[e] the risk of harm to Gaby resulting from her mother's physical discipline." In distinguishing this matter from N.J. Div. of Child Prot. & Permanency v. K.N.S., 441 N.J. Super. 392 (App. Div. 2015) and N.J. Div. of Child Prot. & Permanency v. J.L.G., 450 N.J. Super. 113 (App. Div. 2015), he notes, that his "verbal direction to Gina to stop hitting Gaby constituted a reasonable and meaningful effort to protect Gaby." He argues that the trial court's determination of whether he was negligent or grossly negligent by not interceding "is a conclusion of law to which we are not required to defer." Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 308 (2011) (quoting N.J. Div. of Youth & Family Servs. v. A.R., 419 N.J. Super. 538, 542-53 (App. Div. 2011)).

Our Supreme Court has discussed "what standard of care is codified by the phrase 'failure to exercise a minimum degree of care.'" G.S. v. Dep't of Human Servs., Div. of Youth & Family Servs., 157 N.J. 161, 178 (1999). "Essentially, the concept of willful and wanton misconduct implies that a person has acted with reckless disregard for the safety of others." Id. at 179. "[A] guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181. "[A] parent or guardian's past conduct can be relevant and admissible in determining risk of

harm to the child." N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 573 (App. Div. 2010).

In finding that David abused or neglected Gaby, the court reviewed the security camera footage and emphasized:

> [Of] real importance to this [c]ourt is [Gaby's] demeanor during these encounters. She doesn't speak around her stepfather. She keeps her arms around herself and shreds her tissues nervously. She is standing alone and refuses to take one step in [David's] direction. She refuses to sit down when offered a seat. She stands stunned and scared throughout the entire three-video episode involving [David], which is very different than she is with her mother, . . . where she is crying and emotional. She never speaks to him directly. In fact, she barely looks . . . at him.

While the trial court recognized that "maybe there is insufficient evidence to know how hard [David] hit [Gaby] that day or if he even hit her that day," it noted that under the totality of circumstances, "the evidence is clear . . . that [David] knew what [Gina] was doing that day and previous days and that such excessive corporal punishment, the use of the belt, was an accepted form of punishment for this child."

By David's own admission, he revealed that "he has whooped [Gaby] in the past but due to his profession he is done with her" and has not hit her in about six months. The mere knowledge of a beating, without actually seeing it,

14

may be sufficient to establish a noninterfering parent or guardian committed abuse or neglect. See J.L.G., 450 N.J. Super. at 121.

As the trial court concluded, David "obviously felt it was acceptable for him to sit back and let his wife discipline and hit her daughter while he did nothing to stop it . . . . [or] intervene. This does not relieve him of responsibility in this [c]ourt." A review of the totality of the record demonstrates that David's current inaction and admitted prior behavior rose to the level of gross negligence or recklessness as a matter of law.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2102-18T2